## METABOLIFE INTERNATIONAL, INC., Plaintiff,

v.

## Susan WORNICK, George Blackburn, and Hearst–Argyle Television, Inc., Defendants.

### No. Civ. 99–1095–R.

United States District Court, S.D. California.

Nov. 17, 1999.

---

Michael L. Converse, Akin Gump Strauss Hauer and Feld LLP, Washington, DC, Stephen A. Mansfield, Akin Gump Strauss Hauer and Feld, Los Angeles, CA, for Plaintiff.

Michael J. Weaver, Latham and Watkins, San Diego, CA, Steven J. Comen, Avani S. Kherdekar, Goodwin Procter and Hoar, Boston, MA, for Defendants Susan Wornick, Hearst Argyle Television, Inc.

Gregory D. Roper, Luce Forward Hamilton and Scripps, San Diego, CA, fir Defendant George Blackburn.

## ORDER GRANTING DEFENDANTS' ANTI–SLAPP MOTIONS

RHOADES, District Judge.

### I. Overview

Plaintiff Metabolife International, Inc. ("Metabolife") claims that, when Defendants made statements as part of a television news broadcast addressing the safety of Plaintiff's product, Metabolife 356, they committed defamation, slander, trade libel, and intentional and negligent interference with prospective economic advantage. Responding to these allegations, Defendants have filed motions (1) to dismiss the complaint under California Code of Civil Procedure § 425.16 (the "anti-SLAPP statute"), (2) to dismiss for lack of personal jurisdiction, and (3) to dismiss for improper venue or, alternatively to transfer venue. At Defendants' requests, this order addresses only the motions to dismiss under California's anti-SLAPP statute. For the reasons set forth herein, the Court grants Defendants' anti-SLAPP motions and strikes Metabolife's complaint in its entirety.

### II. Background

Metabolife is a California corporation that manufactures and distributes herbal dietary supplements. The company's primary product is "Metabolife 356," a dietary supplement designed to promote weight loss and boost energy. Metabolife 356 is "the best selling dietary supplement for weight loss in the United States." (Compl.¶ 8.) While Metabolife's workforce is based in San Diego, California, Metabolife sells its products through independent distributors which operate retail stands in shopping centers throughout the United States.

The primary active ingredient in Metabolife 356 is the Chinese herbal supplement *ma huang,* a naturally-occurring

form of the substance ephedrine. Because the Food and Drug Administration ("FDA") considers *ma huang* to be a food, not a drug, Metabolife can sell its product without undergoing the FDA's rigorous "new drug" approval process. *See* 21 U.S.C. § 321 (1999) (defining "food," "drug," and "dietary supplement," which includes "an herb or other botanical"); 21 U.S.C. § 355 (establishing the "new drug" application process). Nonetheless, concerns about the safety of dietary supplements containing ephedrine have animated recent debates in government. For example, in 1997, the FDA proposed a rule establishing a dosage regimen and labeling requirements for dietary supplements containing ephedrine alkaloids, like *ma huang*. *See* 62 Fed.Reg. 30678 (1997); Unites States General Accounting Office, *Dietary Supplements: Uncertainties in Analyses Underlying the FDA's Proposed Rules on Ephedrine Alkaloids* 1 (July 1999) ["Uncertainties"]; *see also* Massachusetts Dept. Of Public Health, *DPH Issues Advisory on Herbal Dietary Supplements Containing Ephedra* (Aug. 2, 1996). The FDA's proposed rule responds to over 800 Adverse Event Reports ("AERs") linking ingestion of ephedrine-based diet pills to serious health effects, including stroke and death. *See Uncertainties,* at 5. In response to these concerns, the media has produced numerous broadcasts and articles on the safety of ephedrine-based diet pills. *See, e.g.,* Charles Babcock, *Stimulant Propels Diet Empire: Herbal Coalition Fights FDA's Proposed Safety Regulation,* Wash. Post, May 24, 1999, at A1; Claudie Kalb, *Weighing the Health Risks: Do diet pills like Metabolife work? And are they safe?,* Newsweek, Oct. 18, 1999, at 59. While no regulations currently exist, the debate rages on.

Metabolife has sued Defendants for their public contributions to this debate. Defendant Hearst–Argyle Television, Inc. ("WCVB") owns numerous television and radio stations across the nation, including WCVB–TV, a local television station in Boston, Massachusetts. From May 11 to May 13, 1999, WCVB broadcast a three-part news report (the "broadcasts") on the safety of Plaintiff's product, Metabolife 356. The broadcasts marked the culmination of a "five-month investigation" by Defendant Wornick, a WCVB reporter and presented a negative perspective on the health risks of Metabolife 356 use. The broadcasts include narration by Wornick and footage from several interviews, including one with Defendant Blackburn, a leading authority in obesity research.

After the broadcasts aired, Metabolife began a campaign against the onslaught of negative media attention. Metabolife immediately bought a full page ad refuting the broadcasts in the May 15, 1999 addition of the Saturday Boston Globe. The ad concludes "We will see Ms. Wornick and WCVB–TV in court." (Def. Blackburn's R. Ex. B.) The company also wrote letters to media companies designed to deter similar broadcasts on the safety concerns surrounding Metabolife 356. (Janis Decl.Exs. 8–10.) Finally, Metabolife filed the present action, seeking damages based on numerous statements and alleged defamatory implications arising from the broadcasts. The complaint alleges causes of action for defamation, slander, trade libel, and intentional and negligent interference with prospective economic advantage. For convenience of presentation, the Court lists the alleged statements and defamatory implications before addressing each in turn:

*Alleged Defamatory Statements*

1. Defendant Wornick: "Every expert we asked said Metabolife is not safe because of its main ingredient, *ma huang.*"

2. Defendant Blackburn: "You can die from taking this product."

3. Anchor: "Will the legislature here be considering just restricting, or banning, Metabolife?"

Defendant Wornick: "I think that is what they are going to do eventually. Health officials have told us that they would like to regulate very tightly how it is sold."

4. Wornick: "Remember that ad calling Metabolife clinically tested for safety? Metabolife was tested at Vanderbilt University, but only for two weeks and, according to their attorney, not for safety. Vanderbilt officials have ordered Metabolife to stop making that claim."

5. Wornick: "Does this company have any credibility at all, doctor?"

Blackburn: "None."

6. "The substance ephedrine has long had the attention of law enforcement, because it's also the main ingredient in the illegal drug methamphetamine. On the streets they call it meth, or speed."

7. Wornick: "[Ellis] started a vitamin company that later became Metabolife— makers of diet pills with ephedrine. Again, the same controlled substance found in methamphetamine."

8. Wornick: "[Interviewee] thinks she reacted to ephedrine, a powerful heart stimulant that's the main ingredient in the illegal drug methamphetamine, known on the streets as speed."

*Defamatory Implications*[1]

1. Implications from statements (1), (2), and (3):

(a) Taking Metabolife is deadly;

(b) The consensus in the medical community is that taking Metabolife is deadly; and

(c) Taking Metabolife as directed poses a risk of death to the average person that is substantially greater than that posed by other over-the-counter legal products.

2. Implications from statements (4) and (5):

(d) Metabolife knows that the product it makes and sells to the public is deadly;

(e) There are no scientific studies concluding that Metabolife 356 is a safe product, and no scientific support for the assertion that Metabolife 356 is a safe product;

(f) Metabolife misrepresents to the public that scientific studies have concluded that Metabolife 356 is a safe product, and that there is scientific support for the assertion that Metabolife 356 is a safe product;

(g) Metabolife 356 has not been tested for safety; and

(h) Metabolife misrepresents to the public that Metabolife 356 has been tested for safety.

3. Implications from (6), (7), and (8):

(I) The main ingredient of Metabolife 356 is an illegal controlled substance;

(j) The main ingredient of Metabolife 356 is identical to the main ingredient in the illegal drug methamphetamine, or "speed"; and

(k) Metabolife intentionally and deceitfully passes off as a dietary supplement a product that is essentially no different than the illegal drug methamphetamine.

On June 21, 1999, Defendants filed motions to dismiss under California's anti-SLAPP statute, Cal.Civ.Proc.Code § 425.16. Pursuant to that statute, the Court stayed all discovery upon notice of the motion to dismiss. By order dated September 24, 1999, the Court ordered limited discovery to enable Metabolife to meet its burden of opposing Defendants'

---

**1.** Metabolife supports the existence of these defamatory implications with the results of the Marylander Survey, an opinion survey conducted on voluntary participants selected from among shopping mall patrons. Survey participants were shown the broadcasts in their entirety and then were asked to respond to a number of questions regarding the content of the broadcasts. First, participants answered an open-ended question asking for a description of what they had seen. (Marylan-

der Decl. ¶ 10.) Second, participants selected from a prepared list the propositions that they believed best captured the substance of the broadcasts. (Marylander Decl. ¶¶ 11–12.) Based on the Marylander Survey, Metabolife presents evidence such as "73% of survey respondents understood [the] broadcasts to say that the main ingredient in Metabolife 356 is an illegal, controlled substance." (Metabolife's Mem. In Opp. To Def.'s Ex Parte Appl. to Stay Further Discovery at 20.)

motions, but later stayed all discovery pending the present order. As explained below, the Court does not address issues for which Metabolife should be granted discovery prior to a decision.

### III. Discussion

Defendants have moved to dismiss Plaintiff's claims pursuant to California's anti-SLAPP statute.[2] "SLAPP" stands for "strategic lawsuit against public participation," and the statute provides a mechanism for a defendant to strike civil actions brought primarily to chill the exercise of free speech. *See* Cal.Civ.Proc.Code § 425.16(b)(1). The California Legislature passed the statute recognizing "the public interest to encourage continued participation in matters of public significance ... and [finding] that this participation should not be chilled through abuse of the judicial process." 5 Witkin, *California Procedure,* § 962, at 422 (4th ed.1997).

A defendant in a civil action may move under the anti-SLAPP statute to strike any cause of action based on his "act in furtherance of [the] right to petition or free speech." *See* Cal.Civ.Proc.Code § 425.16(b). An "act in furtherance" includes "any ... oral statement ... made in a ... public forum in connection with an issue of public interest." Cal.Civ.Pro.Code § 425.16(e); *Lafayette Morehouse, Inc. v. Chronicle Publ'g Co.,* 37 Cal.App.4th 855, 862, 44 Cal.Rptr.2d 46 (1995) (allowing motion by media defendants). Each of Metabolife's causes of action is based on statements published by Defendants as part of a widely disseminated television broadcast, which is undoubtedly a public forum. Metabolife rightly concedes that "the safety of products intended for human consumption is a matter of public concern." (Metabolife's R. to Courts Order on Preparation for Sept. 8 Hearing at 11.) Therefore, Defendant's anti-SLAPP motions apply to every cause of action that Metabolife asserts.

■ To ensure that participation in public debate is not "chilled," the anti-SLAPP statute establishes a procedure for early dismissal of meritless lawsuits against public speech. Once the defendant establishes prima facie that the statute applies, the plaintiff must show a "reasonable probability" of prevailing on its claim. *See Wilcox v. Superior Court,* 27 Cal.App.4th 809, 824–25, 33 Cal.Rptr.2d 446 (1994); Cal.Civ. Proc.Code § 425.16(b). Plaintiff must demonstrate that "the complaint is legally sufficient and supported by a prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." *See Wilcox,* 27 Cal. App.4th at 823, 33 Cal.Rptr.2d 446. This burden is "much like that used to determine a motion for nonsuit or directed verdict," which mandates dismissal when "no reasonable jury" could find for the plaintiff. *See id.* at 824, 33 Cal.Rptr.2d 446 (citing *Rowe v. Superior Court,* 15 Cal. App.4th 1711, 1723, 19 Cal.Rptr.2d 625 (1993)); *see also* Fed.R.Civ.P. 50(b) (permitting post-verdict judgment as a matter of law against a party when there is no basis for a "reasonable jury" to find for that party). The defendant's anti-SLAPP motion should be granted, therefore, when the plaintiff presents an insufficient legal basis for the claims or "when no evidence of sufficient substantiality exists to support a judgment for the plaintiff." *Wilcox,* 27 Cal.App.4th at 828, 33 Cal.Rptr.2d 446 (citing *Carson v. Facilities Dev. Co.,* 36 Cal.3d 830, 838–39, 206 Cal.Rptr. 136, 686 P.2d 656 (1984)).

In opposing dismissal under the anti-SLAPP statute, Plaintiff must establish its prima facie case with competent and admissible evidence. *See id.* at 830, 206 Cal. Rptr. 136, 686 P.2d 656; *Macias v. Hartwell,* 55 Cal.App.4th 669, 675, 64 Cal. Rptr.2d 222 (1997); *Evans v. Unkow,* 38 Cal.App.4th 1490, 1497, 45 Cal.Rptr.2d 624 (1995). Plaintiff "cannot simply rely on the allegations in the pleadings ... to

2. The Court applies California law to interpret the anti-SLAPP statute, which, although state law, supports a motion to dismiss in federal diversity actions. *See United States v. Lockheed Missiles & Space Co., Inc.,* 190 F.3d 963, 972–73 (9th Cir.1999).

make the evidentiary showing," but must present independent evidence to establish its prima facie case in tort. *See Church of Scientology of Cal. v. Wollersheim,* 42 Cal. App.4th 628, 656, 49 Cal.Rptr.2d 620 (1996). In this case, because the speech that forms the basis for Metabolife's action concededly addresses a matter of "public concern," Metabolife must prove that statements were false and uttered with "actual malice." *See Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 14, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990); *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 776, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986) (finding that the "Constitution require[s] us to tip the balance in favor of protecting true speech" in order to "ensure that true speech on matters of public concern is not deterred"). Thus, provided that Metabolife has been granted adequate discovery, the anti-SLAPP statute requires Metabolife to establish a prima facie case of falsity and actual malice to avoid dismissal.

■ Because the Court has stayed all discovery, it will not consider Metabolife's prima facie evidence of actual malice at this early stage in the litigation. To satisfy due process, the plaintiff's burden must be compatible with the early stage of the action and the limited discovery opportunities. *See* Cal.Civ.Proc.Code § 425.16(f), (g). In federal court, "if a defendant desires to make a special motion to strike based on the plaintiff's lack of evidence, the defendant may not do so until discovery has been developed sufficiently to permit summary judgment under Rule 56." *See Rogers v. Home Shopping Network, Inc.,* 57 F.Supp.2d 973, 982 (C.D.Cal.1999) (citing *United States v. Lockheed Missiles & Space Co.,* 171 F.3d 1208 (9th Cir.1999)). Summary judgment is often considered inappropriate early in the case, for example, when the moving party controls the information required to oppose the motion.

*See Rogers,* 57 F.Supp.2d at 980. In that situation, courts "are lenient in granting further time for discovery." *See id.* (quoting Wright, et al., Federal Practice & Procedure § 2740 (2d ed.1996)). Thus, the Court should not scrutinize Plaintiff's evidence of facts uniquely within the Defendants' control before ordering discovery to enable Plaintiff to meet its burden of opposing Defendants' anti-SLAPP motions. Evidence of "actual malice," which exists when the speaker "entertained serious doubts as to the truth of his statement," *see Newton v. National Broad. Co.,* 930 F.2d 662, 668 (9th Cir.1990) (en banc) (citing *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 511 n. 30, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984)), is uniquely within the control of Defendants and, therefore, generally should not be tested at this early stage of the litigation, *see Rogers,* 57 F.Supp.2d at 981.

Because the Court has stayed all discovery, this order does not weigh Metabolife's evidence to determine whether it has established a prima facie case of actual malice. Rather, the discussion that follows addresses the legal defenses of Defendants and whether Metabolife has established a prima facie case of falsity.[3] The Court considers each statement and alleged implication in turn.

A. "You can die from taking this product."

■ Metabolife asserts all causes of action against all Defendants on the basis of Defendant Blackburn's televised statement, made during an interview with Susan Wornick, that "you can die" from taking Metabolife 356. The Court grants Defendants' anti-SLAPP motions as to this statement for two reasons: (1) Metabolife has not provided admissible prima facie evidence that this statement is false,

---

**3.** Unless otherwise indicated, the Court's analysis of each statement and alleged implication applies to all causes of action alleged by Metabolife. Metabolife is required to prove falsity in support of each cause of action either because it is an element of the

plaintiff's proof in a "public concern" case (defamation, slander, and trade libel claims), or because the cause of action, as pled, requires that the Court first find defamation (interference with prospective economic advantage).

and (2) Defendant Blackburn's statement is entitled to First Amendment protection as a "rational interpretation" of a conflicting and ambiguous source.

### 1. Metabolife's Evidence of Falsity is Inadmissible Under *Daubert*[4]

To prove falsity, Metabolife submits numerous declarations by scientific experts which purport to establish that, when taken as directed, Metabolife 356 poses no more than minor health risks. The Court holds that Metabolife's evidence is inadmissible under Fed.R.Evid. 702, and Metabolife, therefore, does not meet its burden of proving a prima facie case of falsity. Accordingly, the Court grants Defendants' anti-SLAPP motions and strikes Metabolife's claim based on Dr. Blackburn's commentary.[5]

Metabolife must meet its burden of proving prima facie falsity with admissible evidence. *See Wilcox v. Superior Court*, 27 Cal.App.4th 809, 830, 33 Cal.Rptr.2d 446 (1994); *Evans v. Unkow*, 38 Cal. App.4th 1490, 1497, 45 Cal.Rptr.2d 624 (1995). In federal court, that burden requires presentation of scientific evidence that is admissible under Federal Rule of Evidence 702.[6] Rule 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed.R.Evid. 702 (1999).

The Supreme Court has determined the standard under Rule 702 for admitting expert scientific testimony in federal courts. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Court held that the Federal Rules of Evidence displaced the traditional "general acceptance" test of *Frye v. United States* because the rigid general acceptance test was at odds with the "liberal thrust" of the Federal Rules. *Id.* at 587–89, 113 S.Ct. 2786.

4. The Court notes, initially, that the parties disagree about the precise meaning of the simple phrase uttered by Defendant Blackburn. Metabolife asserts that, when Dr. Blackburn said "you can die," he conveyed to listeners the message "you can die from taking Metabolife as directed." Thus, Metabolife claims that it must prove the falsity only of that message as conveyed to listeners. Defendants resist Metabolife's addition of the phrase "as directed," and seek to have Metabolife disprove the less controversial proposition that Metabolife 356 can kill when abused. The Court neglects to choose between the parties interpretations of Defendant Blackburn's statement because it holds that, even if the Court adds Metabolife's phrase "as directed," Metabolife has not provided any admissible prima facie evidence of falsity.

5. The Court's ruling also disposes of the alleged implications from Dr. Blackburn's statement. Because the Court finds that Metabolife's scientific evidence of the safety is inadmissible, Metabolife cannot prove the falsity of the alleged implications "taking Metabolife is deadly," "the consensus in the medical community is that taking Metabolife is deadly," and "taking Metabolife as directed poses a risk of death to the average person that is substantially greater than that posed by other over-the-counter legal products."

6. Metabolife insists that the Court must accept its scientific evidence as true because, under the anti-SLAPP statute, the Court cannot "weigh the evidence or determine questions of credibility, but accept[s] all evidence favorable to the plaintiff as true." *See, Wilcox*, 27 Cal.App.4th at 828, 33 Cal.Rptr.2d 446. The Court disagrees. Metabolife must meet its burden of proving prima facie falsity with admissible evidence. *See Wilcox v. Superior Court*, 27 Cal.App.4th 809, 830, 33 Cal. Rptr.2d 446 (1994); *Evans v. Unkow*, 38 Cal. App.4th 1490, 1497, 45 Cal.Rptr.2d 624 (1995). In federal ·court, that means that Metabolife must produce scientific evidence that is admissible under Rule 702. Scrutinizing Metabolife's scientific evidence at this early stage is consistent with Ninth Circuit case law applying Rule 702 to exclude scientific evidence at the pretrial motion stage. *See, e.g., Lust v. Merrell Dow Pharmaceuticals, Inc.*, 89 F.3d 594, 595 (9th Cir.1996); *Claar v. Burlington Northern Railroad Co.*, 29 F.3d 499, 500 (9th Cir.1994). Moreover, ruling early on Metabolife's scientific evidence promotes the purpose of the Federal Rules of Evidence to "eliminat[e] unjustified expense and delay," *see* Fed.R.Evid. 102 (1999), since it wastes time and resources to proceed on a claim based on evidence that would never be admissible at trial.

Under *Daubert*, the district court plays the role of "gatekeeper" by undertaking the daunting task of weeding out "bad science" that is unworthy of admission into evidence in a federal court.[7] *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1316 (9th Cir.1995) (*"Daubert II "*). To do this, the Court must make a preliminary determination that the proffered expert scientific testimony is both relevant and reliable. *Daubert*, 509 U.S. at 589–92, 113 S.Ct. 2786. Scientific evidence is reliable if it is based on an assertion that is grounded in methods of science. The focus is solely on the principles and methodology, not on the conclusion. *Id.* at 595–94, 113 S.Ct. 2786.

■ The *Daubert* Court set out a non-exclusive list of "general observations" to aid the federal trial judge in making the preliminary determination of relevancy and reliability: (1) whether the scientific theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether a particular technique has a known potential rate of error; and (4) whether the theory or technique is generally accepted in the relevant scientific community. *Id.* at 593–94, 113 S.Ct. 2786.

On remand, the Ninth Circuit held that a "very significant factor to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinion expressly for purposes of testifying." *Daubert II*, 43 F.3d at 1317. An expert who testifies about research that the expert herself conducted independent of litigation provides "important, objective proof that the research comports with the dictates of good science." *Id.*

■ Metabolife's scientific evidence is inadmissible under *Daubert* because it lacks sufficient indicia of reliability. Metabolife's evidence of falsity consists of numerous declarations that rely on the following scientific bases: (1) Metabolife 356 animal toxicity studies conducted by Shanghai Medical University and National Taiwan University (the "Chinese animal studies"), (2) an unpublished, incomplete cardiovascular risk study undertaken at the Columbia Medical Center (the "Columbia Study"), (3) short-term efficacy studies by Vanderbilt University Medical Center and St. Luke's Roosevelt Hospital Center (the "efficacy studies"), and (4) numerous published scientific articles addressing issues related to the safety of ephedrine.

Before addressing the reliability of the particular bases for the expert opinions in this case, the Court notes that, with one exception,[8] the opinions expressed in Metabolife's expert declarations were formed for purposes of this litigation rather than "growing naturally and directly out of research [the experts] have conducted independent of the litigation." [9] *See Daubert II*, 43 F.3d at 1317. Because Metabolife's

**7.** The district court exercises its discretion to determine the admissibility of scientific evidence. *See United States v. Cordoba*, 194 F.3d 1053, 1999 Daily Journal D.A.R. 11478 (9th Cir.1999) (" '[I]t is very much a matter of discretion with the [trial] court whether to receive or exclude the evidence' and appellate courts should 'not reverse in such a case unless the ruling is manifestly erroneous.' ") (quoting *General Electric Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 517, 139 L.Ed.2d 508 (1997)).

**8.** The exception is Dr. Ruth Strauss, a researcher for the Columbia Study, who submits a declaration, based on her own research, stating that Metabolife 356 does not

create "any significant risk of adverse cardiac event in otherwise healthy obese people." (Strauss Decl. ¶ 18.) While Dr. Strauss' opinion may have been formed independently of this litigation, the Columbia Study on which it relies suffers from other indices of unreliability discussed herein.

**9.** In this regard, the Court feels like Judge Kozinski in *Daubert II*, 43 F.3d at 1318, who wrote: "None of the plaintiff's experts has published his work ... in a scientific journal or solicited formal review by his colleagues.... It's as if there were a tacit understanding ... that what's going on here is not science at all, but litigation."

experts formulated their opinions for purposes of this litigation, the Court must scrutinize closely the stated bases for those opinions:

[i]f the proffered expert testimony is not based on independent research, the party proffering it must come forward with other objective, verifiable evidence that the testimony is based on "scientifically valid principles." One means of showing this is by proof that the research and analysis supporting the proffered conclusions have been subjected to normal scientific scrutiny through peer review and publication.

*Id.* at 1318.

The Court holds that the bases for Metabolife's expert opinions are unreliable and render the opinions inadmissible under *Daubert.*

First, the Court follows numerous other decisions by holding that Chinese animal studies are inadmissible due to the uncertainties in extrapolating from effects on mice and rats to humans. *See, e.g., Turpin v. Merrell Dow Pharm., Inc.,* 959 F.2d 1349, 1359 (6th Cir.1992), *cited with approval in Daubert,* 509 U.S. at 596, 113 S.Ct. 2786; *In re "Agent Orange" Liability Litigation,* 611 F.Supp. 1223, 1241 (E.D.N.Y.1985); *Lynch v. Merrell–National Laboratories, Division of Richardson–Merrell, Inc.,* 830 F.2d 1190, 1194 (1st Cir.1987). The Chinese animal studies are short-term, high-toxicity studies of effects on animals that took place outside the United States government's regulatory supervision. First, the nature of the Chinese animal studies requires extrapolation from animals to humans, from high doses to low doses, and from short to long-term exposures. Difficulties in such extrapolation has lead to controversy concerning the admissibility of such studies. *See* Bernard Goldstein & Mary Sue Henifen, *Reference Guide on Toxicology, in* Federal Judicial Center Reference Manual on Scientific Ev-

idence 182, 193 (1994). Further, because the research took place outside the United States and was not part of the FDA drug application process, it is not governed by federal codes setting the standards for good laboratory practice. *See id.* at 192–93 (noting the existence of government oversight for animal toxicity studies, including FDA good laboratory practice standards).[10] Finally, Metabolife commissioned the Chinese animal studies itself and the research results have not been through the peer review and publication process. In short, the Chinese animal studies possess none of the indicia of reliability necessary for admissibility under *Daubert.*

The Columbia Study is similarly unreliable. The study was commissioned by Metabolife and is not finished. While Metabolife contends that Dr. Strauss' portion of the Columbia Study, which she cites to support her expert opinion, has been carried through to completion, there is no evidence that any research results have been subject to peer review. On the contrary, Metabolife has successfully petitioned the Court to issue a protective order maintaining the secrecy of Dr. Strauss' research results. (Court's Order Permitting Filing Under Seal, filed Sept. 1, 1999.)

Aside from its unreliability, the Columbia Study is also of questionable relevancy to the falsity of the statement "you can die from taking Metabolife." Metabolife's experts have consulted a "draft" article by the Columbia Study team on the *efficacy* of *ma huang* as a weight loss supplement, but this short-term study can have little relevance to the safety of the substance. Moreover, Dr. Strauss' portion of the Columbia Study dealt only with particular cardiovascular effects. Because there are more ways to die than through "significant adverse cardiovascular events," Dr. Strauss' opinion and study, even if reliable, would be of limited relevance to the falsity of Dr. Blackburn's statement. Due to the

**10.** Significantly, animal studies alone cannot justify FDA approval of a new drug, but only serve as a necessary first step to obtaining FDA permission to test in humans. *See* Jeffrey P. Cohn, U.S. Food and Drug Administration, The Beginnings: Laboratory and Animal Studies (visited Oct. 14, 1999) <www.fda.gov/fdac/special/newdrug/begin.htm>.

minimal reliability and relevance of the Columbia Study, the Court finds that its results are inadmissible under *Daubert.*

Similarly, the short-term efficacy studies submitted by Metabolife are incapable of supporting the falsity of the statement "you can die from taking Metabolife." The only statement for which efficacy studies could possibly provide reliable and relevant evidence of falsity is "you cannot lose weight by taking Metabolife." Nonetheless, Metabolife seeks to employ its efficacy studies to demonstrate the safety of its product by pointing out that, over the course of the short-term studies, no test subjects suffered from detected adverse health effects. This is not reliable research methodology for testing the safety of a supplement intended for long-term use. Safety testing is not even the purpose of the study's research design. The Court therefore finds that the efficacy studies are inadmissible under *Daubert* for establishing the falsity of the Dr. Blackburn's statements.

Metabolife's experts also base their opinions on published scientific articles addressing issues related to the safety of ephedrine. While some of these articles are published and peer-reviewed, they are inadmissible as relied upon by Metabolife's experts. Because Metabolife relies on expert opinions formulated specifically for trial, its experts must "explain precisely how they went about reaching their conclusions and point to some objective source ... to show that they have followed the scientific method." *See Daubert II,* 43

F.3d at 1319. Metabolife's experts do not explain precisely how they use the scientific literature to support their opinion. Rather, the experts list numerous articles in scientific journals and simply state that, after reviewing these articles, they are convinced that Metabolife 356 cannot cause serious health problems.

Despite the assurances of Metabolife's experts, a review of the listed scientific literature raises applicability questions that the experts do not address. For example, the list includes articles titled "Ephedrine as an Anoretic," "Ephedrine Therapy In Asthmatic Children," and "Contribution of Bat and Skeletal Muscle to Thermogenesis Induced by Ephedrine in Man." [11] The missing explanation as to how articles such as these support the opinions of Metabolife's experts renders those opinions inadmissible under *Daubert.*[12]

### 2. Dr. Blackburn's Statement is Protected First Amendment Speech

■ Even if Metabolife had proved its prima facie case of falsity, the Court would still dismiss its claim because, in the context of the current debate surrounding the safety of ephedrine-based diet pills, Dr. Blackburn's statement that "you can die" from taking Metabolife 356 constitutes unactionable First Amendment speech. The Court holds that Dr. Blackburn's statement is protected as a "rational interpretation" of the ambiguous and unresolved state of scientific knowledge regarding the safety of products like Metabolife.

11. The one source that Metabolife repeatedly touts as substantial evidence of safety—Dennis Jones, *Safety of Ephedra Herbs; A Preliminary Report,* File: HSE25JN5 1 (1995) ("Jones article")—is by its own title, a "preliminary" result. Moreover, far from being published and peer reviewed, the Jones article is stamped "CONFIDENTIAL," which implies that it is not open for review and comment in the scientific community. Thus, while the applicability of this report is subject to less doubt than much of Metabolife's scientific literature, the Court finds that the Jones article lacks sufficient indicia of reliability to be admissible under *Daubert.*

12. Metabolife's submissions with regard to the scientific literature are very similar to those held inadmissible in *Daubert II:* "[P]laintiff's experts have relied on animal studies, chemical structure analyses, and epidemiological data, [but] they neither explain the methodology ... followed to reach their conclusions nor point to any external source to validate that methodology. We've been presented with only the experts' qualifications, their conclusions and their assurances of reliability. Under Daubert that's not enough." *Daubert II,* 43 F.3d at 1319.

A line of Supreme Court cases establishes special protection for First Amendment speech that is a "rational interpretation" of an ambiguous source. *See Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984); *Time, Inc. v. Pape,* 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971). Confronting the difficulties to public commentators of offering original interpretation of ambiguous sources, the Court held, in those cases, that the defendant "did not publish a falsification sufficient to sustain a finding of actual malice." *See Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 519, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991). "The protection for rational interpretation serves First Amendment principles by allowing an author the interpretive license that is necessary when relying on an ambiguous source." *Id.*

The *Bose* case is particularly useful in the present analysis because it involved critical statements about Plaintiff's product, a stereo speaker system. The defendant in *Bose* published an article in its magazine stating that the sound from the Bose speaker system tended to "wander around the room." *See Bose,* 466 U.S. at 488, 104 S.Ct. 1949. In a bench trial, the district court held that the statement was false because, in fact, the reporter had heard sound wandering only between the speakers and along the wall, not around the entire room. *See id.* at 490, 104 S.Ct. 1949. On that basis, the district court entered judgment against the defendant. The court of appeals reversed and the Supreme Court affirmed that reversal, stating that adoption of the "around the

room" language was " 'one of a number of possible rational interpretations' of an event 'that bristled with ambiguities'." *See id.* at 512, 104 S.Ct. 1949 (quoting *Pape,* 401 U.S. at 290, 91 S.Ct. 633). Thus, though the statement "reflect[ed] a misconception, [this] does not place the speech beyond the outer limits of the First Amendment's broad protective umbrella." *Id.* Rather, "erroneous statement is inevitable in free debate, and ... must be protected if the freedoms of expression are to have the 'breathing space' that they 'need ... to survive.'" *Id.* (quoting *New York Times v. Sullivan,* 376 U.S. 254, 271–72, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)).

Given the controversy surrounding the safety of Metabolife 356, Defendant Blackburn's statement is incapable of supporting a finding of actual malice.[13] Dr. Blackburn's statement presents an even stronger case for protection than in *Bose* because, unlike in *Bose,* the source of the statement is so complex and "ambiguous" that this Court cannot find that the statement is false. Rather, the Court has previously found that Metabolife's evidence of falsity is inadmissible because it is scientifically unreliable. Moreover, while controversy surrounds the interpretation of the FDA's Adverse Event Reports, Defendant Blackburn could easily support his statement with the reported deaths that motivated the FDA's proposed rule. *See* 62 Fed.Reg. 30678 (1997). Given the controversial and ambiguous nature of Defendant Blackburn's source material, the Court holds that he "did not publish a falsification sufficient to sustain a finding of actual malice."[14] *See Masson,* 501 U.S at 519, 111 S.Ct. 2419.

---

**13.** The Court stresses that, because it has stayed all discovery, it does not rule on the basis that Metabolife has not proven a prima facie case of actual malice. Rather, the Court holds as a matter of law that, given the controversy surrounding the safety of ephedrine-based diet pills, the character of Dr. Blackburn's statement—namely, public comment on the scientific controversy—is non-actionable First Amendment speech.

**14.** Metabolife's evidence of Dr. Blackburn's affiliation with competing companies is irrelevant to the actual malice determination. "Actual malice" turns exclusively on the extent of Defendant's knowledge regarding the truth of the statements uttered. It cannot be supported by evidence of hostility or "intention to harm." *See Greenbelt Cooperative Publ'g Ass'n v. Bresler,* 398 U.S. 6, 10–11, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970); *Beckley Newspapers Corp. v. Hanks,* 389 U.S. 81, 82, 88 S.Ct. 197, 19 L.Ed.2d 248 (1967); *see also Harte-*

Dr. Blackburn's statements are protected by the First Amendment as a "rational interpretation" of the complex and unresolved scientific debate concerning the safety of ephedrine-based diet pills like Metabolife 356.[15] Because the safety of Metabolife 356 remains an open question of substantial public importance, contributions to the debate are protected by the First Amendment. If a consensus is ultimately reached that the product is safe, Metabolife may have been an unintended victim of the Constitution's ardent free speech protections. We risk such results in order to foster a public forum for the robust debate that identifies scientific truths. In the words of Judge Easterbrook, scientific controversies "must be settled by the methods of science rather than by the methods of litigation. More papers, more discussion, better data, and more satisfactory models—not larger awards of damages—mark the path toward superior understanding of the world around us." *Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir.1994).

B. "Every expert we asked said Metabolife is not safe because of its main ingredient, *Ma Huang*."

Metabolife seeks to impose liability on Defendants Wornick and WCVB on the basis of Wornick's "every expert" statement and the alleged implication therefrom that "the consensus in the medical community is that taking Metabolife is deadly." The Court strikes Metabolife's claims on these basis because (1) Metabolife cannot prove the falsity of the alleged defamatory statement, and (2) the statement is not capable of supporting the implication that Metabolife ascribes to it.

Wornick's statement derives its allegedly defamatory nature from the portion which calls Metabolife 356 "not safe," not the portion which notes that "every expert" reached this conclusion.[16] As the Court discusses above, Metabolife cannot prove a prima facie case of the falsity of that defamatory portion because it offers only inadmissible scientific evidence of safety. Thus, the Court strikes Metabolife's claims based on the "every expert" statement under the anti-SLAPP statute.

◼ Metabolife also cannot proceed on the basis of the alleged defamatory implication. The Court should not imply defamatory meaning to a defendant's statements unless the words uttered are "reasonably capable of sustaining" the implication. *See Dodds v. American Broad. Co.*, 145 F.3d 1053, 1063 (9th Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 866, 142 L.Ed.2d 769 (1999); *Eastwood v. National Enquirer, Inc.*, 123 F.3d 1249, 1256 (9th Cir.1997). The Court makes this determination by examining the statements themselves, in context of the entire broadcast. *See Auvil v. CBS 60 Minutes*, 67 F.3d 816, 822 (9th Cir.1995); *Underwager v. Channel 9 Australia*, 69 F.3d 361, 366 (9th Cir. 1995) (finding that the court examines the "totality of the circumstances" in de-

---

*Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 664–65, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) (holding that newspaper's motive to increase profits cannot support a finding of actual malice). Thus, Metabolife's bias evidence does not affect the Court holding that, given the ambiguous state of knowledge concerning the safety of ephedrine-based diet pills, Dr. Blackburn's statement is incapable of supporting a finding of actual malice.

**15.** The Court recognizes the novelty its application of the "rational interpretation" standard to public scientific comment. Nonetheless, particularly in the context of scientific contribution to public health debates, the Court believes itself justified in applying the

doctrine in this context. If the First Amendment provides heightened protection for rational comment on stereo speakers, it should also protect scientific comment on issues as important as public health. *See* Michael Kent Curtis, *Monkey Trials: Science, Defamation, and the Suppression of Dissent*, 4 Wm. & Mary Bill Rts.J. 507, 582 (1995) (arguing for a application of the "rational interpretation" doctrine to scientific comment against public figures).

**16.** For example, Metabolife would clearly have no claim if Wornick had stated that "every expert declined to comment on the safety of Metabolife 356."

termining whether a statement implies a factual assertion). "It is the statements themselves that are of primary concern in the analysis." *Auvil,* 67 F.3d at 822. "Defamatory meaning may not be imputed to true statements. The defamatory character of the language must be apparent from the words themselves." *Id.; see also Isuzu Motors Ltd. v. Consumers Union of U.S., Inc.,* 12 F.Supp.2d 1035, 1045 (C.D.Cal.1998) (finding that the court must "refrain from scrutinizing what is not said to find a 'defamatory meaning which the article does not convey to a lay reader' ") (quoting *Church of Scientology of California v. Flynn,* 744 F.2d 694, 696 (9th Cir.1984)).

■■■ Here, Wornick's statement does not imply a "consensus" in the scientific community, as Metabolife asserts. The statement is explicitly limited to the experts consulted by Defendants Wornick and WCVB. It would be unreasonable to believe that Defendants consulted the entire scientific community before making the statement. Yet, such an inference is logically necessary to finding the implication urged by Metabolife. The Court finds, therefore, that Wornick's "every expert" statement is not capable of supporting the alleged implication asserted by Metabolife.[17] The Court strikes Metabolife's claim based on this alleged implication.

C. Statements about "just restricting, or banning, Metabolife?"

■■■ Metabolife seeks to hold Defendants Wornick and WCVB liable for Wor-

nick's prediction regarding what steps, if any, government regulators would take regarding sales of Metabolife 356. The Court strikes Metabolife's claim based on these statements under the anti-SLAPP statute because the statements are nonactionable opinion.

Because defamation requires false statements of fact, mere opinions are not actionable. *See Standing Comm. on Discipline v. Yagman,* 55 F.3d 1430, 1439 (9th Cir.1995) (holding that an attorney's comments questioning the integrity of a judge were not actionable in a disciplinary proceeding as they were expressions of opinion based on stated facts); *Rizzuto v. Nexxus Products Co.,* 641 F.Supp. 473, 481 (S.D.N.Y.) (holding that statements of opinion were not actionable in trade libel case), *aff'd,* 810 F.2d 1161 (2d Cir.1986); *cf. Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 19, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) (holding that statements of opinion are protected by the First Amendment in a defamation action unless they "imply a false assertion of fact"). An opinion is a statement that is not "provable as false": "[A] statement of opinion relating to matters of public concern which does not contain a *provably false* factual connotation will receive full constitutional protection." *See Milkovich,* 497 U.S. 1, 20, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) (citing *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986)).

Defendant Wornick's statement is a prediction of uncertain future actions by gov-

---

17. The Court does not believe, as Metabolife insists, that the Marylander Survey compels Metabolife's defamatory implications. First, the Court determines whether a statement carries an alleged implication as a threshold question of law; only if the Court answers this question yes does the jury then address whether the statement was so understood by the audience. *See Isuzu Motors,* 12 F.Supp.2d at 1045; Restatement (Second) of Torts § 614 (1977). While the Marylander Survey may be useful to the jury in its role, it does not assist the Court in making the threshold determination of law, for which the Court relies primarily on the statements

themselves. *See Auvil,* 67 F.3d at 822. Second, even if the Marylander Survey factored into the Court's decision, it would be of negligible value. The only evidence that viewers discerned the implications alleged by Metabolife is participants selection from a list of propositions *proposed by Metabolife.* The list of propositions was leading and overly suggestive, as it contained only two types of statements to select among: (1) positive or neutral statements clearly unsubstantiated by the broadcasts (*e.g.,* "Metabolife has been evaluated an approved by the FDA"), or (2) the negative "implications" that Metabolife asserts as the basis for this lawsuit.

ernment regulators. By definition, such a statement is not "provable as false" when uttered because the future has not happened yet. When Wornick made the statement, it was impossible to determine what form of regulation, if any, would govern sales of Metabolife 356. Thus, Wornick's statement was not "provable as false" when made, and cannot constitutionally serve as the basis for liability.

Metabolife attempts to render Wornick's statement actionable by asserting certain factual implications regarding the health risks of taking Metabolife that purportedly arise from the broadcast of the statement in context.[18] The Court rejects Metabolife's attempts to generate liability through alleged implications from Wornick's literal statement for two reasons: (1) Wornick's statement is not "reasonably capable" of sustaining the meaning that Metabolife ascribes to it, and (2) even if the Court could find the implication urged by Metabolife, Metabolife cannot meet its burden of proving falsity under the anti-SLAPP statute.

Defendant Wornick's predictions regarding government regulation of the sale of Metabolife 356 are not capable of supporting the very specific factual implications regarding risk of death that Metabolife attempts to ascribe to them. On its face, Wornick's statement does not address the particular health risks associated with Metabolife 356. At most, her statement could be found to imply a general accusation that Metabolife 356 requires regulatory supervision to be safe enough for public consumption. The Court refuses to imply Metabolife's factual assertions. Moreover,

even if the Court found that Wornick conveyed the alleged implications, Metabolife could not meet its prima facie burden of proving falsity under the anti-SLAPP statute because, as the Court finds above, its scientific evidence of safety is inadmissible under *Daubert*.

**D. Statements regarding the Vanderbilt Study.**

Because Defendant Wornick's statements regarding the Vanderbilt study are literally true, Metabolife relies on several alleged implications from these statements as the basis for liability.[19] The Court holds that, even if Wornick's statements create the alleged implications, Metabolife cannot establish a prima facie case that the implications state false propositions of fact.

 In public concern cases, the Court grants full First Amendment protection to all substantially true statements despite minor inaccuracies. *See Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516–17, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991); *see also Maheu v. Hughes Tool Co.*, 569 F.2d 459, 465–66 (9th Cir.1977) (finding that a statement is protected if the "imputation is substantially true so as to justify the 'gist' or 'sting' of the remark"). In other words, to prove falsity, a plaintiff must show that the implication "would have had a different effect on the mind of the [audience] from that which the pleaded truth would have produced." *See Masson*, 501 U.S. at 517, 111 S.Ct. 2419.

Even assuming, *arguendo*, that Wornick's literally true statements about the

18. Metabolife claims that the following implications arise from Wornick's statement, in the context of the broadcasts as a whole: (1) taking Metabolife is deadly; (2) the consensus in the medical community is that taking Metabolife is deadly; and (3) taking Metabolife as directed poses a risk of death to the average person that is substantially greater than that posed by other over-the-counter legal products.

19. Metabolife claims that Wornick's statements imply the following factual propositions: (1) Metabolife knows that the product

it makes and sells to the public is deadly; (2) There are no scientific studies concluding that Metabolife 356 is a safe product, and no scientific support for the assertion that Metabolife 356 is a safe product; (3) Metabolife misrepresents to the public that scientific studies have concluded that Metabolife 356 is a safe product, and that there is scientific support for the assertion that Metabolife 356 is a safe product; (4) Metabolife 356 has not been tested for safety; and (5) Metabolife misrepresents to the public that Metabolife 356 has been tested for safety.

Vanderbilt Study support the alleged defamatory implications, Metabolife cannot prove that those defamatory implications are false. The first proposition, regarding the "deadly" nature of Metabolife 356, suffers the same fate as the alleged implications derived from Dr. Blackburn's "you can die" statement. Metabolife has not offered any admissible scientific evidence to establish the safety of its product.

The remaining propositions, which focus on the alleged implication that *no* scientific studies support the safety of Metabolife 356, are protected as substantially true. At the time of the broadcasts, the Chinese animal studies were the only studies touting the safety of Metabolife 356. For the reasons that the Court discusses above,[20] those studies are so insubstantial as to be essentially the same as "no studies" for purposes of establishing the "gist" of Defendants' public concern speech. The Court considers it unlikely that, had Wornick noted the existence of the Chinese animal studies, it "would have had a different effect on the mind of the [audience]" than the alleged implication that there were no studies at all. *See Masson*, 501 U.S. at 517, 111 S.Ct. 2419. Short-term studies on mice and rats in Asia do not bolster public confidence in product safety. Accordingly, the Court will not permit Metabolife to assert claims on the basis of the alleged implications from the Vanderbilt Study statements.

E. **Statements about the "Credibility" of Metabolife.**

■■■ Metabolife seeks to hold Defendants liable for Dr. Blackburn's statement that the company lacks "credibility." Like Defendant Wornick's predictions regarding government regulation, this statement is non-actionable opinion. Whether or not a company is credible is not "provable as false," *see Milkovich*, 497 U.S. at 19, 110 S.Ct. 2695, because credibility is not a concept capable of definite and universal measurement. Rather, statements regarding credibility reflect the character and perspective of the speaker and could trigger unresolvable, yet rational, disagreement among speakers. As such, Dr. Blackburn's statement resembles the Supreme Court's example of non-actionable opinion in *Milkovich:* "[t]he statement, 'In my opinion Mayor Jones shows his abysmal ignorance by accepting the teachings of Marx and Lenin,' would not be actionable." *Milkovich*, 497 U.S. at 20, 110 S.Ct. 2695. Dr. Blackburn, therefore, is entitled to the "breathing space" that "[f]reedoms of expression require in order to survive." *See Hepps*, 475 U.S. at 772, 106 S.Ct. 1558. Accordingly, the Court strikes Metabolife's claims based on Dr. Blackburn's "credibility" statement.[21]

Moreover, as with Defendant Wornick's statements regarding the Vanderbilt Study, the Court refuses to permit liability based on the defamatory implications alleged by Metabolife.[22] As discussed above, Metabolife cannot prove falsity with respect to those implications.[23]

F. **Statements noting that ephedrine is a main ingredient of both Metabolife 356 and methamphetamine.**

■■■ The last category of statements for which Metabolife seeks damages are

---

20. *See supra* pp. 1168–69.

21. In so ruling, the Court consciously applies the constitutional standard for non-actionable opinion in circumstances for which the Supreme Court has explicitly "reserved judgment." *See Milkovich*, 497 U.S. at 20 n. 6, 110 S.Ct. 2695 (reserving judgment in cases involving non-media defendants). The Court refuses to treat Dr. Blackburn differently than Defendants Wornick and WCVB because (1) Dr. Blackburn and the two media Defendants published their statements in the same forum, and (2) the Court can discern no reason why Dr. Blackburn is entitled to less "breathing space" for his expression than are members of the media. *See Hepps*, 475 U.S. at 772, 106 S.Ct. 1558.

22. Metabolife asserts the same defamatory implications on the basis of Dr. Blackburn's "credibility" statement and Defendant Wornick's Vanderbilt Study statements.

23. *See supra* pp. 1174–75.

**1176**

Defendant Wornick's statements that ephedrine is the main ingredient in both Metabolife 356 and the illegal drug methamphetamine. The Court grants Defendants' anti-SLAPP motions and strikes all claims based on the statements themselves and any alleged implications therefrom.

Defendant Wornick's statements are protected by the First Amendment because they are substantially true. All of the statements and one of Metabolife's alleged implications [24] focus on the similarity between the main ingredient in Metabolife 356, *ma huang,* and pure ephedrine, a precursor chemical to methamphetamine. In order to prove falsity, Metabolife offers expert testimony that ephedrine and *ma huang* are not identical. (Farber Decl. ¶¶ 14, 15.) Even Metabolife's own expert concludes that "the effects of Ma Huang are similar to ephedrine," while noting differences in potency and absorption rates between the two. (*Id.*) Significantly, ingredient labels for Metabolife 356 and discount knock-offs of the product describe "Ma Huang Concentrate" as "naturally-occurring ephedrine." The fact that Metabolife requires expert scientific opinion to describe the limited differences between *ma huang* and ephedrine convinces the Court that such fine distinctions would have had no effect on the state of minds of the audience had they been raised by Defendant Wornick. Accordingly, Wornick's statements are substantially true and protected by the First Amendment.

Metabolife also asserts claims on the basis of two additional implications derived from Wornick's statements: (1) the main ingredient of Metabolife 356 is an illegal controlled substance, and (2) Metabolife intentionally and deceitfully passes off as a dietary supplement a product that is essentially no different than the illegal drug methamphetamine. The Court holds that these statements are not "reasonably capable" of being implied from Defendant Wornick's statements.[25] Defendant Wornick's statements do not concern the regulatory status of *ma huang* or make a direct comparison between Metabolife 356 and methamphetamine. Rather, the statements consistently compare the *primary ingredient* of Metabolife 356 to the *primary ingredient* of methamphetamine. Only by misconstruing Defendant Wornick's carefully chosen words could a listener come away with the impression that *ma huang* itself is an illegal narcotic or that Metabolife 356 is identical to methamphetamine.[26] Consequently, the Court strikes Metabolife's claims based on those alleged implications.

## IV. Conclusion

For the reasons stated above, the Court grants Defendants' anti-SLAPP motions to strike as to each of Metabolife's claims. Accordingly, the Court dismisses the complaint with prejudice.

IT IS SO ORDERED.

---

**24.** This refers to the implication that "the main ingredient in Metabolife 356 is identical to the main ingredient in the illegal drug methamphetamine."

**25.** *See* Court's discussion, *supra,* pp. 1172–73.

**26.** For a discussion of how such misconceptions can be provoked, see the Court's evaluation of Metabolife's Marylander Study, *supra* note 17.