264 F.3d 832 (9th Cir. 2001)
 METABOLIFE INTERNATIONAL, INC., A CALIFORNIA CORPORATION, PLAINTIFF-APPELLANT,
v.
SUSAN WORNICK, AN INDIVIDUAL; GEORGE BLACKBURN, AN INDIVIDUAL; HEARST-ARGYLE TELEVISION, INC., A DELAWARE CORPORATION, D/B/A WCVB-TV, DEFENDANTS-APPELLEES.
 No. 99-56814
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted May 9, 2001--Pasadena, California
Filed September 5, 2001
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 Counsel Stephen Mansfield (argued), Akin, Gump, Strauss, Hauer & Feld, Los Angeles, California, for the plaintiff-appellant.
 Steven J. Comen (argued), and J. Anthony Downs, Goodwin, Procter & Hoar, Boston, Massachusetts, for defendants-appellees Hearst-Argyle Television, Inc. and Susan Wornick.
 Robert O'Regan (argued), Burns & Levinson, Boston Massachusetts, and Gregory D. Roper, Luce, Forward, Hamilton & Scripps, San Diego, California, for defendant-appellee George Blackburn.
 Appeal from the United States District Court for the Southern District of California John S. Rhoades, District Judge, Presiding D.C. No. CV-99-01095JSR/RBB
 Before: Pamela Ann Rymer, Michael Daly Hawkins, and Ronald M. Gould, Circuit Judges.
 
 
 1
 Opinion by Judge Hawkins; Partial Concurrence and Partial Dissent by Judge Rymer
 
 Hawkins, Circuit Judge
 
 2
 The heart of this case lies at the difficult three-way intersection of the news media's desire to inform the public about the potential dangers of an over-the-counter herbal supplement, California's public policy interest in the prompt resolution of so-called "SLAPP suits," and the liberal policies underlying the discovery provisions of the Federal Rules of Civil Procedure. Metabolife appeals the dismissal with prejudice of state law claims against (1) an investigative reporter for local Boston television station WCVB-TV, (2) the station itself, (3) the station's parent corporation, and (4) a Harvard Medical School professor, Dr. George Blackburn. The complaint arises from a three-part "investigative report" that aired on WCVB in May 1999 detailing dangers allegedly associated with the use of Metabolife's main product, the herbal weight loss and energy supplement "Metabolife 356." Metabolife sought relief in the district court under California law.
 
 FACTS AND PROCEDURAL HISTORY
 
 3
 The underlying facts are not in dispute. In May 1999, a local Boston television station (WCVB-TV) aired a three-part series of "investigative reports" prepared by its reporter Susan Wornick ("Wornick").[1] These reports challenged the safety of Metabolife 356)[2] as well as the public policy influence of Metabolife founder Joseph Ellis, who a decade earlier sustained a felony conviction based on methamphetamine manufacturing.
 
 
 4
 When the station would not grant a retraction, Metabolife filed suit in district court based on diversity jurisdiction.[3] Metabolife asserted claims under California state law for: (1) defamation; (2) slander; (3) trade libel; and (4) negligent and intentional interference with prospective economic advantage. Metabolife challenged eight discrete statements from the broadcast before the district court, only four of which are at issue on appeal:
 
 
 5
 1. A statement by Harvard Medical School professor Dr. George Blackburn, an obesity specialist, that "You can die from taking this product [Metabolife 356]."[4]
 
 
 6
 2. A statement by Wornick that, "Every expert we asked said Metabolife [356] is not safe because of its main ingredient, ma huang."
 
 
 7
 3. A statement by Wornick allegedly implying that Metabolife 356 had not been tested for safety.[5]
 
 
 8
 4. Statements by Wornick that Metabolife and methamphetamine share the same main ingredient, ephedrine.[6]
 
 
 9
 The defendants -Wornick, Dr. Blackburn, the station, and the station's parent corporation -filed motions to strike Metabolife's complaint pursuant to California's"antiSLAPP" statute, Cal. Civ. Proc. Code §§ 425.16.[7] Defendants refused to engage in discovery pending the outcome of their motions pursuant to Cal. Civ. Proc. Code §§ 425.16(g).
 
 
 10
 Metabolife responded by moving to compel full responses to its written discovery requests. The district court temporarily stayed discovery and asked Metabolife to itemize the discovery it needed to respond to the anti-SLAPP motions, which Metabolife did. The district court then reversed its field, and ordered Metabolife to respond to the anti-SLAPP motions without discovery, itemized or otherwise.[8]
 
 
 11
 Despite the lack of discovery, Metabolife's opposition to the anti-SLAPP motions included over twenty affidavits and more than 750 pages of exhibits, including the opinions of six experts on issues relating to Metabolife 356's safety. After receiving these materials and in preparation for its next hearing, scheduled to decide venue and perhaps the anti-SLAPP issues, the district court directed the parties to be prepared to address twenty-one questions at the hearing, some of which went to the reliability of the scientific evidence presented by Metabolife in its opposition to the anti-SLAPP motions.
 
 
 12
 The district court held its motions hearing, focusing solely on the anti-SLAPP motions. After the hearing, the court ordered limited discovery on two issues: (1) Wornick's and WCVB's editing of Dr. Blackburn's interview and (2) what experts Wornick had spoken with to back up her statement that "Every expert we spoke to said Metabolife[356] is not safe because of its main ingredient, ma huang." However, just six days later the court rescinded this order, halting all discovery under the anti-SLAPP statute. Metabolife filed an objection, and the court responded by ordering briefing on five final questions.
 
 
 13
 After receiving this post-hearing material, the district court issued its decision, granting the defendants' anti-SLAPP motions. Metabolife Int'l Inc. v. Wornick, 72 F. Supp. 2d 1160 (S.D. Cal. 1999). On the statement, "You can die from taking this product," the district court held that it did not matter whether the statement was construed literally or, as Metabolife argued it should be, as "You can die from taking this product as directed."[9] Id. at 1167, n.4. The court held that the defendants prevailed either way because "Metabolife has not provided any admissible prima facie evidence of falsity." Id. The district court arrived at this ruling because"Metabolife's scientific evidence [allegedly proving safety if taken as directed] is inadmissible under Daubert because it lacks sufficient indicia of reliability." 72 F. Supp. 2d at 1168. The district court also held, alternatively, that Dr. Blackburn's speech was protected by the First Amendment as a rational interpretation "of the ambiguous and unresolved state of scientific knowledge regarding the safety of products like Metabolife." Id. at 1166-67.
 
 
 14
 The district court dismissed the claim based on the statement that "Every expert we asked said Metabolife is not safe because of its main ingredient, ma huang," on the same Daubert concerns. Id. at 1172-73. The court also held that the statement "does not imply a `consensus' in the scientific community," and thus could not support the defamatory implication asserted by Metabolife. Id. at 1173.
 
 
 15
 Wornick's statement allegedly implying that Metabolife 356 had not been tested for safety was dismissed because her comments regarding the Vanderbilt University study were "literally true." Id. at 1174. The district court also held that "[e]ven assuming . . . that Wornick's literally true statements about the Vanderbilt Study support the alleged defamatory implications [that Metabolife 356 was not tested for safety], Metabolife cannot prove that those defamatory implications are false" because Metabolife had put forward no admissible evidence of affirmative safety studies. Id. at 1174-75.
 
 
 16
 Finally, on the statements whose alleged implication was that, through the common presence of ephedrine, Metabolife 356 and methamphetamine share the same main ingredient, the district court ruled that the statements were substantially true. Id. at 1176. The court disregarded Metabolife's expert testimony that ephedrine and ma huang are not identical because "that Metabolife requires expert scientific opinion to describe the limited difference between ma huang and ephedrine[10] convinces the Court that such fine distinctions would have no effect on the state of minds [sic] of the audience. . . ." Id.
 
 
 17
 Metabolife appealed the district court's decision on these three issues and "all interlocutory orders that gave rise to that judgment." We have jurisdiction under 28 U.S.C.§§ 1291.
 
 STANDARDS OF REVIEW
 
 18
 The admissibility of scientific evidence under Federal Rule of Evidence 702 is reviewed for abuse of discretion. Kennedy v. Collagen Corp., 161 F.3d 1226, 1227 (9th Cir. 1998). The district court's decision not to permit additional discovery pursuant to Federal Rule of Civil Procedure 56(f) is reviewed for abuse of discretion. DeGrassi v. City of Glendora, 207 F.3d 636, 641 (9th Cir. 2000). The district court's conclusions of law are reviewed de novo. Cigna Prop. and Cas. Ins. Co. v. Polaris Pictures Corp., 159 F.3d 412, 418 (9th Cir. 1998).
 
 ANALYSIS
 
 19
 This case presents three discrete, though related, issues, the district court's: (1) exclusion of Metabolife's scientific evidence; (2) decision under the California anti-SLAPP statute not to allow Metabolife discovery; and (3) conclusion that the challenged statements are alternatively protected by the first amendment. Each issue will be dealt with individually; the analysis begins with a description of the state statute under which this case was dismissed.
 
 I. California's Anti-SLAPP Statute
 
 20
 The anti-SLAPP statute was enacted to allow early dismissal of meritless first amendment cases aimed at chilling expression through costly, time-consuming litigation.[11] Under the statute, a civil defendant may move to strike a cause of action based on an "act in furtherance of [the ] right to petition or free speech." Cal. Civ. Proc. Code §§ 425.16(b). An "act in furtherance" includes "any . . . oral statement . . . made in a . . . public forum in connection with an issue of public interest." §§ 425.16(e).
 
 
 21
 Metabolife concedes that "the safety of products intended for human consumption is a matter of public concern, " and agrees that the statements challenged were made in a public forum. Thus, Metabolife concedes that the anti-SLAPP statute's first step is satisfied in this case.
 
 
 22
 Once it is determined that an act in furtherance of protected expression is being challenged, the plaintiff must show a "reasonable probability" of prevailing in its claims for those claims to survive dismissal. §§ 425.16(b); Wilcox v. Superior Court, 33 Cal. Rptr. 2d 446, 455 (Cal. Ct. App. 1994). To do this, the plaintiff must demonstrate that "the complaint is legally sufficient and supported by a prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." Wilcox, 33 Cal. Rptr. 2d at 454. This burden is "much like that used in determining a motion for non-suit or directed verdict," which mandates dismissal when "no reasonable jury" could find for the plaintiff. Id. at 455 (citing Rowe v. Superior Court , 19 Cal. Rptr. 625, 632 (Cal. Ct. App. 1993)). Thus, a defendant's anti-SLAPP motion should be granted when a plaintiff presents an insufficient legal basis for the claims or "when no evidence of sufficient substantiality exists to support a judgment for the plaintiff." Id. at 457 (citing Carson v. Facilities Dey, Co., 36 Cal.3d 830, 838-39 (1984)).
 
 
 23
 Because the defendants' speech addressed a matter of"public concern," Metabolife must show that the statements were false and made with "actual malice." Milkovich v. Lorain Journal Co., 497 U.S. 1, 14 (1990). As a consequence of staying all discovery, the district court held that it would "not weigh Metabolife's evidence to determine whether it has established a prima facie case of actual malice. Rather, the [court's analysis] address[ed] the legal defenses of [the] Defendants and whether Metabolife . . . established a prima facie case of falsity." 72 F. Supp. 2d at 1166. As noted above, the district court held that Metabolife could not establish its prima facie case as to the falsity of the three statements it challenges on appeal. Id. at 1166-76.
 
 
 24
 II. Exclusion of Metabolife's Scientific Evidence
 
 
 25
 Metabolife could not meet its burden on falsity below after the district court excluded all of its scientific evidence regarding the safety of Metabolife 356 when used as directed. Under the anti-SLAPP statute, a plaintiff must meet its burden of proving prima facie falsity with admissible evidence. Wilcox, 33 Cal. Rptr. 2d at 459; Evans v. Unkow, 45 Cal. Rptr. 2d 624, 628 (Cal. Ct. App. 1995). The district court held that Metabolife's scientific evidence was not admissible under Daubert v. Merrell Dow Pharms., Inc., 43 F.3d 1311 (9th Cir. 1995) ("Daubert II"). 72 F. Supp. 2d at 1167-70.
 
 A. The Daubert Standard
 
 26
 Scientific evidence is admitted pursuant to Federal Rule of Evidence 702. In Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 587-89 (1993) (Daubert I), the Supreme Court held that Rule 702 displaced the prior "general acceptance" test. Under Daubert II, the district court acts as a "gatekeeper," excluding "bad science" that does not carry sufficient indicia of reliability for admission under Rule 702. 43 F.3d at 1316. This is accomplished through a preliminary determination that the proffered evidence is both relevant and reliable.[12] Daubert I, 509 U.S. at 589-92.
 
 
 27
 Scientific evidence is reliable if it is based on an assertion that is grounded in methods of science -the focus is on principles and methodology, not conclusions. Id. at 595-96. The Supreme Court listed four non-exclusive factors for consideration in the reliability analysis: (1) whether the scientific theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether a particular technique has a known potential rate of error; and (4) whether the theory or technique is generally accepted in the relevant scientific community. Id. at 593-94.
 
 
 28
 In Daubert II we noted that a "very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." 43 F.3d at 1317. If the evidence is not based upon independent research, the district court must determine whether there exists any "other objective, verifiable evidence that the testimony is based on scientifically valid principles." Id. at 1317-18 (internal quotation marks omitted). Peer review is the chief way of satisfying this requirement, though it may also be met by
 
 
 29
 precisely [explaining] how [the experts ] went about reaching their conclusions and point[ing] to some objective source -a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like -to show that they have followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field.
 
 
 30
 Id. at 1318-19 (citing United States v. Rincon, 28 F.3d 921, 924 (9th Cir. 1994)).
 
 B. Scientific Evidence Presented
 
 31
 Metabolife presented scientific evidence through the declarations of six experts and the results of scientific research. Five of the experts presented opinions based on"scientific risk assessment."[13]. The sixth expert, Dr. Ruth Hammel Strauss, interpreted the results of an unpublished cardiovascular risk study that she conducted at Columbia Medical Center. Besides the Columbia study, the results of two other research projects were also submitted to the district court: (1) animal toxicity tests conducted at Shanghai Medical University and National Taiwan University and (2) short-term efficacy studies at Vanderbilt University Medical Center and St. Luke's-Roosevelt Hospital Center.
 
 
 32
 After noting that, with the exception of Dr. Strauss's, all of the opinions expressed in the declarations were prepared for the purpose of litigation, the court dismissed the"scientific risk assessments" because it found the underlying sources unreliable and the explanation of methodology lacking. 72 F. Supp. 2d at 1167-70. The district court also found the Asian animal studies, Dr. Strauss's interpretation of the Columbia study, and the efficacy studies too unreliable to be admitted. Id.
 
 
 33
 a. The Asian Animal Studies
 
 
 34
 The district court held that, as a matter of law, animal studies are inadmissible "due to the uncertainties in extrapolating from effects on mice and rats to humans." Id. at 1169. The district court was also troubled because the animal studies "took place outside the United States government's regulatory supervision." Id.
 
 
 35
 The district court's ruling was incorrect. First, Daubert II itself recognized that animal studies are not per se inadmissible and should be subjected to substantive analysis, just like other scientific evidence. 43 F.3d at 1319 (conducting substantive analysis of animal studies). The cases cited by the district court in support of its per se rule -Turpin v. Merrell Dow Pharms., Inc., 959 F.2d 1349 (6th Cir. 1992), Lynch v. Merrell-Nat'l Lab., Div. of Richardson-Merrell, Inc. , 830 F.2d 1190 (1st Cir. 1987), and In re "Agent Orange" Prod. Liab. Lit., 611 F. Supp. 1223 (E.D. N.Y. 1985) -are all preDaubert. 72 F. Supp. 2d at 1169. Beyond that, they are inapposite.
 
 
 36
 Turpin and Lynch were products of the Bendectine birthdefects litigation. These cases merely hold that, in predicting birth defects, the developmental patterns of different species are too different to allow for the presence or absence of a birth defect in one species to be reliable evidence of the likelihood of such a birth defect occurring in another species. Both cases are limited to birth defects; Turpin even notes, "No doubt there may be other animal experiments which, to cite one example, because of the extreme toxicity of the substance tested, would permit a reasonable jury to find that it is more probable than not that the substance causes a similar harm to humans." 959 F.2d at 1359.
 
 
 37
 The other case, In re "Agent Orange", cites a study for the proposition that "[a]nimal studies are aimed at discovering a dose-response relationship, while epidemiological studies show an association between exposure and disease " and concludes that, because of the unique facts of that case, "[t]he animal studies are not helpful in the instant case. . . ." 611 F. Supp. at 1241. Again, the case neither creates nor applies a general rule of unreliability.
 
 
 38
 None of these cases holds that animal studies will always be too unreliable to provide admissible evidence about human health issues. Notwithstanding the moral and ethical problems often surrounding animal studies, in some circumstances they provide useful data about human health.[14] The district court erred in rejecting the animal studies proffered by Metabolife merely because of the species gap.
 
 
 39
 Also wrong is the district court's view that experimentation outside the United States is somehow presumptively unreliable. While regulation of experimentation in the United States may bolster the reliability of results generated domestically, there is no reason to assume that experimentation abroad either would not meet those regulations or is unreliable despite deviancies.
 
 
 40
 We note another of the district court's concerns, the difficulty in extrapolating from high-dose, short-term studies, such as the Asian animal studies, to the low-dose, long-term usage that would result from continued use of Metabolife 356 as directed. 72 F. Supp. 2d at 1169. A variance between experimental conditions and real world usage might indeed be problematic, but we do not read the district court's order as relying on this issue alone, and even if it did, it would be an abuse of discretion to exclude the studies merely because "[d]ifficulties in such extrapolation has lead to controversy concerning the admissibility of such studies." Id. Difficulties with extrapolation might render the animal studies unreliable under Daubert; however, such a determination must be made on problems inherent to the studies themselves, not a general apprehension at inter-species and inter-dosage extrapolation.
 
 
 41
 After United States v. Alatorre, 222 F.3d 1098, 1100 (9th Cir. 2000), we are prohibited from ordering a district court "to conduct pretrial hearings in order to discharge [its Daubert] gatekeeping function." Thus, we merely hold that the district court's analysis of the reliability of these studies constituted an abuse of discretion. While evidentiary hearings might help the district court to conduct an adequate Daubert analysis, "[t]he trial court must have the same kind of latitude in deciding how to test an expert's reliability, and to decide whether and when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides whether or not that expert's relevant testimony is reliable . . . ." Alatorre, 222 F.3d at 1102 (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 153 (1999)).
 
 
 42
 b. The Columbia Study
 
 
 43
 The district court found the Columbia cardiovascular study unreliable because (1) it was commissioned by Metabolife, (2) it was not completely finished, and (3) the part that was finished had not been subjected to peer review. 72 F. Supp. 2d at 1169-70. Metabolife argues that the relevant portion of the study was completed with the data in final form, the research was begun pre-litigation, and Dr. Strauss's declaration "provides a detailed description of the methodology that she used."
 
 
 44
 Excluding the Columbia study was an abuse of discretion. It was plain error to hold that the Columbia study was not finished -while the overall project was ongoing, all of the relevant data had been gathered in final form, and Metabolife presented an expert interpretation of that data. We remand the issue of reliability to the district court. As explained above, when research is begun pre-litigation, it may be reliable without peer review. Daubert II, 43 F.3d at 1317. Rather than disqualify the study because of "incompleteness" or because it was commissioned by Metabolife, the district court should examine the soundness of the methodology employed.
 
 
 45
 The district court also noted in dicta that the Columbia study is "of questionable relevancy" to the falsity of the statement "you can die from taking this product as directed" because the study "dealt only with particular cardiovascular effects," and "there are more ways to die than through `significant adverse cardiovascular events' . . . ." This logic is difficult to follow given that the main health risk allegedly associated with Metabolife 356 is its effect as a stimulant on the cardiovascular system.
 
 
 46
 c. The Short-Term Efficacy Studies
 
 
 47
 An efficacy study is a study that determines whether Metabolife 356 actually helps people lose weight. It is not designed, at least primarily, to be a safety study. Because of this, the district court held that the efficacy studies are "not reliable research methodology for testing the safety of a supplement intended for long-term use. Safety testing is not even the purpose of the study's research design." 72 F. Supp. 2d at 1170. While we decline to create a per se rule about what safety information can be reliably gleaned from efficacy studies, we agree with the district court that any such data generated by the studies at issue in this case lacks sufficient grounding in the scientific method to be admissible under Daubert II.
 
 
 48
 d. Expert Risk Assessment
 
 
 49
 Risk assessment is an accepted methodology practiced extensively throughout the medical, scientific, and regulatory communities over the past thirty years. See Bernard Goldstein & Mary Sue Henifen, Reference Guide on Toxicology in Federal Judicial Center Reference Manual on Scientific Evidence 193 (1994). Standard risk assessment involves four stages: hazard identification, dose-response assessment, exposure assessment, and risk characterization. Id. Metabolife argues that consistent with this methodology, its experts consulted "a wealth of peer-reviewed articles, Food and Drug Administration adverse incident reports,[15] studies, laboratory reports, and other scientific materials to formulate their opinions."
 
 
 50
 The district court rejected the experts' risk assessments because they did "not explain precisely how they use[d] the scientific literature to support their opinion[s]. Rather, the experts list[ed] numerous articles in scientific journals and simply state[d] that, after reviewing these articles [and other information], they [were] convinced that Metabolife 356 cannot cause serious health problems." 72 F. Supp. 2d at 1170. The district court was troubled by the titles of several articles cited, noting that it did not understand "how articles such as these support the opinions of Metabolife's experts. . . ." Id.
 
 
 51
 Metabolife contends that the district court's ruling was an abuse of discretion, arguing that since the articles referred to were in peer-reviewed journals, the experts were not required to explain specifically how each article impacted their opinion. In Metabolife's view, the explanation requirement only arises when there is an absence of peer-reviewed literature directly supporting the position held by the expert.
 
 
 52
 Neither the district court's nor Metabolife's application of the Daubert II requirements in entirely correct. Metabolife is correct that peer-review is highly probative under Daubert II, 43 F.3d at 1318-19, but here the articles were not written by the experts who now wish to interpret them. Metabolife's experts, through risk assessment methodology, are interpreting peer-reviewed articles written by other scientists. The district court, as gatekeeper, correctly noted that the methodology of their interpretation should be open to scrutiny.
 
 
 53
 However, the district court abused its discretion in its summary decision that the risk assessments were not adequately explained. 72 F. Supp. 2d at 1170. In Daubert II, we said that scientific evidence, such as a risk assessment, that is prepared for litigation and not peer-reviewed itself, may be bolstered "through the testimony of . . . [the ] experts" who prepared the evidence. 43 F.3d at 1319. "For such a showing to be sufficient, the experts must explain precisely how they went about reaching their conclusions and point to some objective source . . . to show that they have followed the scientific method. . . ." Id.
 
 
 54
 Here, Metabolife's experts explained the process of risk assessment and pointed to objective sources, but did not, in the district court's view, adequately explain how those objective sources related to their methodologies and eventual conclusions. We agree with the district court that the risk assessment evidence is complex, but complexity is not an adequate ground for exclusion. Examining the declarations of the scientists who prepared the risk assessments, it is clear that they have facially complied with Daubert II's verification requirement for evidence prepared in anticipation of litigation -the declarations explain the methodology of risk assessment and how the data found in peer-reviewed articles and adverse incident reports was used. See 43 F.3d at 1318-19.
 
 
 55
 However, due to the complexity of this evidence and our deferential role in reviewing the admissibility of scientific evidence, we are not prepared to override the district court's role as gatekeeper and hold that the risk assessment evidence is admissible. Rather, we simply hold that the wholly conclusory grounds for exclusion listed by the district court constitute an abuse of discretion. If on remand the district court wishes to plumb the depths of the precise relationship between the materials cited and the conclusions drawn, that is entirely within its province as a Daubert II gatekeeper.
 
 III. Metabolife's Right to Discovery
 
 56
 Metabolife contends that, even if it did not establish a prima facie case of falsity through its submissions to the district court, the district court erred in not allowing it discovery because the discovery-limiting aspects of the anti-SLAPP statute conflict with Federal Rule of Civil Procedure 56.
 
 
 57
 Procedural state laws are not used in federal court if to do so would result in a "direct collision" with a Federal Rule of Civil Procedure. Walker v. Armco Steel Corp. , 446 U.S. 740, 749-50 (1980). In the absence of a "direct collision," the court must make the "typical, relatively unguided Erie Choice." Hanna v. Plumer, 380 U.S. 460, 471 (1965) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938)). This choice should be made by balancing the state interest in its procedural rule with the twin purposes of the Erie doctrine, "discouragement of forum-shopping and avoidance of inequitable administration of the laws." Id. at 468.
 
 
 58
 In United States v. Lockheed Missiles & Space Co., Inc., 190 F.3d 963, 970-73 (9th Cir. 1999), we considered whether two subsections of the anti-SLAPP statute may properly be invoked in federal court. The subsections in question were the special motion to strike, §§ 425.16(b), and the availability of fees and costs, §§ 425.16(c). Id. We held that there is no direct conflict between these two subsections and the Federal Rules, and that the purposes of Erie are advanced by adopting the California procedural rules. Id. However, the court did not address other subsections of the anti-SLAPP statute, such as §§§§ 425.16(f) and (g).
 
 
 59
 Subsection 425.16(f) provides that the anti-SLAPP motion may be filed within sixty days of the filing of the complaint or, at the court's discretion, at any later date. Subsection 425.16(g) provides that the filing of an anti-SLAPP motion automatically stays all further discovery until the court rules on the motion. However, "[t]he court, on noticed motion and for good cause shown, may order that specified discovery be conducted notwithstanding this subdivision."§§ 425.16(g). Together, these two subsections "create a default rule that allows the defendant served with a complaint to immediately put the plaintiff to his or her proof before the plaintiff can conduct discovery." Rogers v. Home Shopping Network, Inc., 57 F. Supp. 2d 973, 980 (C.D. Cal. 1999).
 
 
 60
 We have not previously considered whether subsections 425.16(f) and (g) "directly collide" with the Federal Rules or are contrary to Erie's purposes. However, a district court in our circuit addressed exactly this issue in Rogers, holding that "[i]f this expedited procedure were used in federal court to test the plaintiff's evidence before the plaintiff has completed discovery, it would collide with Federal Rule of Civil Procedure 56." 57 F. Supp. 2d at 980.
 
 
 61
 Although Rule 56(f) facially gives judges the discretion to disallow discovery when the non-moving party cannot yet submit evidence supporting its opposition, the Supreme Court has restated the rule as requiring, rather than merely permitting, discovery "where the nonmoving party has not had the opportunity to discover information that is essential to its opposition." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 n.5 (1986). Taking note of this, the district court in Rogers held:
 
 
 62
 Section 425.16 limits discovery and makes further discovery an exception, rather than the rule. Rule 56 does not limit discovery. On the contrary, it ensures that adequate discovery will occur before summary judgment is considered.
 
 
 63
 Because the discovery-limiting aspects of §§ 425.16(f) and (g) collide with the discoveryallowing aspects of Rule 56, these aspects of subsections (f) and (g) cannot apply in federal court. 57 F. Supp. 2d at 982. We agree.
 
 
 64
 In this case, the district court also adopted the Rogers analysis, but failed to implement it properly. Recognizing that it "should not scrutinize Plaintiff's evidence of facts uniquely within the Defendants' control before ordering discovery to enable Plaintiff to meet its burden of opposing Defendants' anti-SLAPP motions," the district court decided not to rule on the prima facie case of actual malice. 72 F. Supp. 2d at 1166. However, the district court reached the issue of falsity regarding the statement that "Every expert we asked said Metabolife [356] is not safe because of its main ingredient, ma huang." Id. at 1172-73.
 
 
 65
 The district court found against Metabolife on this issue because it felt that Metabolife had not established that its product is safe when used as directed. Id. Since we are remanding for further Daubert II analysis of the proffered scientific evidence, for reasons discussed infra we also order the district court to allow discovery as to which experts Wornick consulted as the basis for this statement.[16] This information is in the defendants' exclusive control, and may be highly probative to Metabolife's burden of showing falsity.
 
 IV. Alternative First Amendment Rulings
 
 66
 A. "You can die from taking this product."
 
 
 67
 The district court held, sua sponte, that"[e]ven if Metabolife proved its prima facie case of falsity" about the statement that "You can die from taking this product, " the "statement is protected as a `rational interpretation' of the ambiguous and unresolved state of scientific knowledge regarding the safety of products like Metabolife. " 72 F. Supp. 2d at 1170. The court concluded that, "Given the controversy surrounding the safety of Metabolife 356, Defendant Blackburn's statement is incapable of supporting a finding of actual malice." Id. at 1171.
 
 
 68
 At this point, the context of Dr. Blackburn's statement should be discussed. Only a small portion of Dr. Blackburn's interview with Wornick was broadcast during the"investigative report" -the rest was edited out. The full text of the relevant portion of the interview shows that Dr. Blackburn actually said:
 
 
 69
 The documents from the FDA hearings remained on the Internet in 1999, when we did this work years ago, and they know, even today as I know, there are people taking similar types of these products who are getting heart attacks, and of course the abuse [sic] can lead to death. But I mean, you can die from taking this product.
 
 
 70
 All the audience heard from this portion of the interview was "You can die from taking this product."
 
 
 71
 On our facts, Dr. Blackburn is not responsible for the subsequent editing of his interview -he is only responsible for his comments in their full and complete form, not the sound bites they became. When viewed in its entirety, his statement makes two assertions: (1) people using products similar to Metabolife 356 have had incidents of heart attacks, and (2) abuse of Metabolife 356 can cause death. Metabolife does not dispute the validity of these statements anywhere in its pleadings. Accordingly, the dismissal of the causes of action against Dr. Blackburn is affirmed.
 
 
 72
 As for the rational interpretation doctrine, it has no bearing on Dr. Blackburn's statement as edited by Wornick and her co-defendants. "The protection for rational interpretation serves First Amendment principles by allowing an author the interpretive license that is necessary when relying upon ambiguous sources." Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 519 (1991). The district court applied the doctrine to Dr. Blackburn's statement because "[i]f the First Amendment provides heightened protection for rational comment on stereo speakers,[17] it should also protect scientific comment on issues as important as public health. " 72 F. Supp. 2d at 1172, fn.15.
 
 
 73
 It is clear that the defendants' editing of Dr. Blackburn's statement changed its meaning. Even if the complete statement is subject to protection under the rational interpretation doctrine, Wornick and her co-defendants cannot piggyback on that protection after they changed its meaning by cutting out the crucial qualification that "abuse " can lead to death. The sound bite presented by Wornick and the station finds no protection in the rational interpretation doctrine.
 
 
 74
 B. "Every expert. . . ."
 
 
 75
 Due to the exclusion of the scientific evidence, the district court held that Metabolife did not present a prima facie case proving the safety of Metabolife 356 when used as directed. 72 F. Supp. at 1172. The district court also ruled in the alternative that "Metabolife cannot proceed on the alleged defamatory implication" that there is some consensus in the scientific community as to its product's unsafe nature because"Wornick's `every expert' statement is not capable of supporting" that implication. Id. at 1173.
 
 
 76
 In order to prevail on the alleged implication of scientific consensus as to Metabolife 356's unsafety, Metabolife must show "that the words . . . uttered were reasonably capable of sustaining that meaning" and "that a jury could reasonably find by clear and convincing evidence that[the defendants] `intended to convey the defamatory impression.' "[18] Dodd v. Am. Broad. Co., 145 F.3d 1053, 1063-64 (9th Cir. 1998) (quoting Newton v. Nat'l Broad. Co., Inc. , 930 F.2d 662, 681 (9th Cir. 1990)).
 
 
 77
 The statement "Every expert we asked said Metabolife [356] is not safe because of its main ingredient, ma huang" is at least susceptible to the implication alleged by Metabolife -that it implies consensus in the scientific community. As the district court noted, 72 F. Supp. 2d at 1166, the issue of "actual malice" (or, to put it another way, intent to convey the defamatory impression) cannot be properly disposed of by a motion to dismiss in this case, where there has been no discovery. Therefore, we reverse the district court's alternative holding that the statement was incapable of supporting the implication alleged. The defendants may challenge whether the asserted implication was made with "actual malice" at summary judgment, should the case proceed that far.
 
 
 78
 The identity of the experts consulted by Wornick is also critical to Metabolife's burden -without the ability to depose the experts relied on, Metabolife will be faced with a moving target its attempt to disprove consensus. Therefore, limited discovery should be allowed on this issue, as discussed supra.
 
 
 79
 C. The Statement Regarding the Vanderbilt Study
 
 
 80
 Metabolife argues that by discounting the Vanderbilt University study, the broadcast implied that Metabolife 356 had not been tested for safety. The argument is largely based on the introductory comment: "Remember that ad calling Metabolife clinically tested for safety?" The logic goes that by then discounting the Vanderbilt study,[19] without mentioning alternative studies of which Wornick was allegedly aware, the broadcast implied that no valid safety testing had been conducted.
 
 
 81
 The district court disagreed, holding that the statement regarding the Vanderbilt study was literally true, and that even if the statement supported the defamatory implication, Metabolife could not prove the implication false because it had submitted no valid affirmative safety studies:
 
 
 82
 The remaining propositions, which focus on the alleged implication that no scientific studies support the safety of Metabolife 356, are protected as substantially true. At the time of the broadcasts, the Chinese animal studies were the only studies touting the safety of Metabolife 356. For the reasons that the court describes above, those studies are so insubstantial as to be essentially the same as "no studies " for purposes of the "gist" if Defendants' public concern speech.
 
 
 83
 72 F. Supp. 2d at 1174-75 (emphasis in original) (footnote omitted). Because we have reversed the district court's exclusion of the Asian animal studies and remanded for further Daubert consideration, supra, we reverse this holding and remand it as well. If on remand the Asian animal studies are again excluded, then the district court's analysis would ring true.
 
 
 84
 D. The Statements that Metabolife 356 and Methamphetamine Share the Same Main Ingredient
 
 
 85
 Metabolife sought relief for statements that Metabolife 356 and methamphetamine share the same main ingredient,"the controlled substance" ephedrine, "a powerful heart stimulant." To prove falsity, Metabolife offers expert testimony that synthetic ephedrine, the active ingredient in methamphetamine, is distinct from ma huang, or naturally-occurring ephedrine, the active ingredient in Metabolife 356. The expert declared that although synthetic and naturally-occurring ephedrine have similar effects, synthetic ephedrine is several times more potent than its naturally-occurring counterpart. The district court rejected Metabolife's argument because "[t]he fact that Metabolife requires expert scientific opinion to describe the limited factual differences between ma huang and[synthetic] ephedrine convinces the court that such fine distinctions would have no effect on the state of minds [sic ] of the audience had they been raised by Defendant Wornick." 72 F. Supp. 2d at 1176.
 
 
 86
 The district court's holding was legally erroneous. A statement is not "substantially true" if it"would have a different effect on the mind of the reader [or viewer ] from that which the pleaded truth would have produced." Masson, 501 U.S. at 517 (quoting R. Sack, Libel, Slander, and Related Problems 139 (1980)). Here, Metabolife introduced evidence that the synthetic ephedrine used in methamphetamine has significantly different potency and absorption rates than naturally-occurring ephedrine. The district court rejected this argument out-of-hand, holding essentially that the argument was too technical for viewers to grasp. 72 F. Supp. 2d at 1176. This holding was in error.
 
 
 87
 We do not agree with the district court that distinctions between natural and synthetic forms of substances are beyond a reasonable viewer's comprehension, especially when the distinction comes with substantial differences in potency and absorption rates. Anyone who knows the difference between a double espresso and a regular cup of coffee should understand that a reasonable jury could have found the differences in potency and absorption significant. The dissent may be correct that synthetic and naturally-occurring ephedrine are technically the same substance, but we are unprepared to make that holding on this record.[20] Deciding only that which was decided below, we reverse and remand the district court's ruling that the statement that Metabolife 356 and methamphetamine share the same ingredient is "substantially true" as a matter of law. On remand, the district court should consider whether it is substantially true that, when considering Metabolife's proffered evidence on potency and absorption (so far as its reliability and relevance extends), synthetic and naturally-occurring ephedrine are the "same main ingredient."
 
 CONCLUSION
 
 88
 The district court's exclusion of Metabolife's scientific evidence regarding the risk assessments, Asian animal studies, and Columbia study on the grounds explicated constituted an abuse of discretion and is REVERSED AND REMANDED. The risk assessments facially satisfy Daubert II 's requirements by explaining their methodology and citation to published, peer-reviewed sources. The Asian animal studies are not unreliable simply because they involve the transposition of data across the species gap and were conducted in China and Taiwan. The Columbia study was completed, prepared independent of litigation, and its methodology appears to have been adequately explained. We do not override the district court's role as gatekeeper and hold that this evidence is admissible. Rather, we simply hold that it was an abuse of discretion to exclude it for the reasons cited. Additionally, the district court's exclusion of the efficacy studies is AFFIRMED.
 
 
 89
 The district court's decision not to allow Metabolife discovery on falsity issues under Federal Rule of Civil Procedure 56(f) is REVERSED because Metabolife identified and requested discovery of probative information solely available from the defendants.
 
 
 90
 The district court's alternative free speech rulings are REVERSED as to all defendants except Dr. Blackburn. The dismissal of the causes of action against Dr. Blackburn is AFFIRMED in light of his complete statement. The other defendants cannot use the rational interpretation doctrine to justify his statement because they materially altered it through editing. Wornick's "every expert" statement is at least legally susceptible to the defamatory implication of scientific consensus. Finally, a reasonable jury could find that it is not "substantially true" that Metabolife 356 and methamphetamine share the same main ingredient.
 
 
 91
 The district court's decision to grant Dr. Blackburn's antiSLAPP motion is AFFIRMED. The district court's decision to grant the other defendants' anti-SLAPP motions is REVERSED. The case is REMANDED to the district court for further analysis of the admissibility of the proffered scientific evidence, discovery as specified, and subsequent reassessment of the other defendants' anti-SLAPP motions. Costs on appeal to appellant and Dr. Blackburn.
 
 
 
 Notes:
 
 
 [1]
 We grant both Metabolife's and the station's motions to present videotapes of the reports under Federal Rule of Appellate Procedure 10(a)(1) (exhibits filed in the district court constitute part of the record on appeal). We have reviewed both tapes. All other pending motions are denied.
 
 
 [2]
 Under 21 U.S.C. §§ 321, Metabolife 356, as an herbal supplement, is a "food," not a "drug," and thus need not undergo the Food and Drug Administration's "new drug" testing policy found at 21 U.S.C. §§ 355.
 
 
 [3]
 Personal jurisdiction and venue were issues raised in the district court, but are not implicated in this appeal.
 
 
 [4]
 The actual sequence challenged was slightly longer:
 Dr. Blackburn: "You can die from taking this product."
 Wornick: "From that product?"
 Dr. Blackburn: "Yes. From this product."
 Wornick: "From Metabolife."
 Dr. Blackburn: "Exactly."
 
 
 [5]
 The actual statement was (Wornick speaking): "Remember that ad calling Metabolife clinically tested for safety? Metabolife was tested at Vanderbilt University, but only for two weeks and, according to their attorney, not for safety. Vanderbilt officials have ordered Metabolife to stop making that claim."
 
 
 [6]
 The actual statements are:
 Wornick: "The substance has long had the attention of law enforcement, because its also the main ingredient in the illegal drug methamphetamine. On the streets they call it meth, or speed."
 Wornick: "[Metabolife founder Ellis] started a vitamin company that later became Metabolife -makers of diet pills with ephedrine. Again, the same controlled substance found in methamphetamine. Wornick: "[Interviewee] thinks she reacted to ephedrine, a powerful heart stimulant that's the main ingredient in the illegal drug methamphetamine, known in the streets as speed."
 
 
 [7]
 "Anti-SLAPP" stands for"Anti-Strategic Lawsuit Against Public Participation." The purpose of the statute is to protect individuals from meritless, harassing lawsuits whose purpose is to chill protected expression.
 
 
 [8]
 The dissent argues that Metabolife conceded that it needed no discovery from the defendant on falsity issues. However, Metabolife filed repeated objections to the district court's decision not to allow discovery, arguing that it needed particular discovery as to specific falsity issues, such as which experts Wornick interviewed as the foundation for her "every expert" statement.
 
 
 [9]
 The dissent suggests that the statement cannot support this implication, an approach which would decide an issue the district court explicitly declined to reach. We prefer to leave the issue to the district court, should it be necessary to reach it on remand.
 
 
 [10]
 Metabolife argued, and argues, that ma huang is naturally-occurring ephedrine, which is distinct from the synthetic ephedrine used to make methamphetamine.
 
 
 [11]
 The California legislature passed the statute recognizing "the public interest to encourage continued participation in matters of public significance . . . [finding] that this participation should not be chilled through abuse of the judicial process." 5 Witkin, California Proc., §§ 962, at 422 (4th ed. 1997).
 
 
 [12]
 We limit our subsequent exposition of the law and analysis of the proffered evidence to reliability because that was the sole issue addressed in the district court. Given our limited, deferential role in reviewing Daubert decisions, we think it best in this case to address the decisions made below (solely reliability), and not reach out to decide others (such as relevance) that can be dealt with in the first instance on remand, if necessary.
 
 
 [13]
 As discussed below, "scientific risk assessment" consists of reviewing incident reports and the literature on a particular topic and then forming an opinion based on the information reviewed. The expert offering the opinion has generated his opinion "in the library " -the opinion is not based on personal experimentation or direct analyses of raw experimental data.
 
 
 [14]
 The dissent contends that Metabolife's experts "recognize" that "the Chinese animal studies offer no basis for extrapolating from effects on mice, rats or beagles to humans." (Dissent at 12288). The expert quoted in support of such "recognition" merely stated that "straight extrapolation of animal data to humans is not appropriate." Of course, bridging the species gap may require sophisticated scientific technique and analysis (i.e., more than "straight extrapolation") to produce reliable and relevant results. Determining whether the proffered analysis of the Asian animal studies meets the necessary threshold is precisely the district court's role as gatekeeper on remand.
 
 
 [15]
 Through adverse incident reports, the FDA collects complaints from people who have negative experiences with "foods " like Metabolife 356.
 
 
 [16]
 The dissent makes the interesting contention that Metabolife has not "proffer[ed] sufficient facts to show that the evidence sought exists, and that it would prevent summary judgment." (Dissent at 12290 (citing Chance v. Pac-Tel Teletrac Inc., 242 F.3d 1151, 1161 n.6 (9th Cir. 2001)). Unless they do not exist, Wornick should be able to divulge which experts she spoke with while preparing her story.
 
 
 [17]
 The district court's reference to stereo speakers is a reference to Bose Corp. v. Consumers Union, 466 U.S. 485 (1984), one of just three Supreme Court cases construing the rational interpretation doctrine. There, the issue was the published review of stereo speakers. The Court concluded "that the result was not an assessment of events that speak for themselves, but `one of a number of possible interpretations of an event `that bristled with ambiguities' and descriptive challenges for the writer.' " Masson, 501 U.S. at 519 (quoting Bose Corp. , 466 U.S. at 512).
 
 
 [18]
 The second prong is the well known "actual malice" requirement dating back to New York Times Co. v. Sullivan, 376 U.S. 254 (1964). See Newton v. Nat'l Broad. Co., Inc., 930 F.2d 662, 681-83 (9th Cir. 1990).
 
 
 [19]
 As discussed, supra, the broadcast was correct in its assertion that the Vanderbilt efficacy study did not prove Metabolife 356's safety.
 
 
 [20]
 We know that synthetic ephedrine is more potent and has a higher absorption rate than natural ephedrine. However, we do not know whether this comes from sheer concentration, or whether the two substances have subtle, but important, chemical differences.
 
 
 
 92
 RYMER, Circuit Judge, concurring in part and dissenting in part:
 
 
 93
 The issue in this case is whether Metabolife Int'l, Inc. established that there is a probability that it will prevail on a defamation claim against WCVB-TV and Susan Wornick (a WCVB reporter) for allegedly defamatory implications in four statements that she made in a telecast about the controversial presence of ma huang, a naturally occurring form of ephedrine (a precursor chemical used to manufacture methamphetamine), in a dietary supplement called Metabolife 356. If not, California's anti-SLAPP statute, Cal. Civ. Proc. Code §§ 425.16, requires striking the suit (as the district court did) in this diversity action.[1]
 
 The four statements are:
 
 94
 "You can die from taking this product."
 
 
 95
 "Every expert we asked said Metabolife is not safe because of its main ingredient, ma huang."
 
 
 96
 "Remember that ad calling Metabolife clinically tested for safety? Metabolife was tested at Vanderbilt University, but for only two weeks and according to their attorney -not for safety."
 
 
 97
 "[The founder of Metabolife] started a vitamin company that later became Metabolife -makers of diet pills with ephedrine. Again, the same controlled substance found in methamphetamine."
 
 
 98
 The false implications upon which Metabolife bases its claims are:
 
 
 99
 "Metabolife as directed on the label can be deadly.
 
 
 100
 "Knowledgeable experts are in agreement that Metabolife 356 is deadly.
 
 
 101
 "Metabolife 356 has not been tested for safety.
 
 
 102
 "Metabolife 356 and the illegal drug methamphetamine share the same main ingredient.
 
 
 103
 Whether Wornick's statements are "reasonably susceptible of an interpretation which implies a provably false assertion of fact," is a question of law. Couch v. San Juan Unified Sch. Dist., 39 Cal. Rptr. 2d 848, 854 (Cal. Ct. App. 1995). Having reviewed the videotapes of the telecasts and Metabolife's submissions, I cannot see the defamatory meaning which Metabolife ascribes to such of Wornick's statements as are not literally or substantially true, bearing in mind that "[c]courts must be cautious lest we inhibit vigorous public debate about public issues. If we err, it should be on the side of allowing free-flowing discussion of current events. We must allow plenty of `breathing space' for such commentary. " Rosenaur v. Scherer, 105 Cal. Rptr. 2d 674, 688 (Cal. Ct. App. 2001) (quotation omitted).
 
 
 104
 Regardless, given the anti-SLAPP lens through which the district court was obliged to view the issue, I cannot see how it got either the need for discovery or the Daubert[2] threshold wrong. Metabolife's claims turn entirely on the falsity implied in the broadcasts, on which, as it conceded in the district court, it had plenty of evidence and needed none from Wornick. This means that we have no call to decide, let alone conclude (as the majority does) that the anti-SLAPP statute and the Federal Rules of Civil Procedure conflict, because discovery can be (and was) tailored by the district court to match the issues necessary to make a §§ 425.16(g) determination in this case. Had the determination turned on malice, rather than falsity, the outcome would have been different, as the district court recognized. But in this case, the court's role in managing discovery was not materially different from what it is in an ordinary diversity action under the Federal Rules.
 
 
 105
 To the extent that resort to Daubert is required, it seems clear to me that the Chinese animal study upon which Metabolife relies for its pre-litigation claims of safety is neither sufficiently reliable nor relevant to save its causes of action. The study itself makes no pretense of concluding that Metabolife is safe for humans based on the fourteen-day mouse, rat, and beagle research that was conducted. Metabolife's other experts review -but do not validate -the Chinese study, and base their opinion of the safety and risk of death associated with Metabolife 356 on a review of the literature as well as use of the product as directed on the label. Even assuming the safety component of the Columbia study has probative value, it is not sufficiently reliable because the study is neither finished, published, nor peer reviewed. As this evidence should not survive a straight-up Daubert determination (which we review for abuse of discretion[3]), there is no way I can say that the district court erred in holding that it was not probable that Metabolife would prevail on the basis of its proffer.
 
 
 106
 For these reasons, I would affirm across the board (as to WCVB-TV and Wornick, as well as to Blackburn).
 
 I.
 
 107
 As the district court pointed out, concerns about the safety of dietary supplements containing ephedrine animated public debate in Washington and various state capitols in the years before the telecast. In 1997, for example, the FDA proposed a rule establishing a dosage regimen and labeling requirements for dietary supplements containing ephedrine alkaloids such as ma huang. See 62 Fed. Reg. 30678 (1997).[4] The FDA's proposed rule responded to over 800 Adverse Event Reports linking ingestion of ephedrine-based products to serious health effects, including stroke and death. A number of articles and broadcasts focused on the safety of such pills, including the WCVB-TV series on the safety of Metabolife 356 which aired February 9, 1999, May 11, 1999, and May 12-13, 1999.
 
 
 108
 The February 9 telecast is not at issue on appeal, but it began by noting that "some health care professionals are concerned because Metabolife contains a controversial herbal supplement, ephedrine, which is under investigation by the [FDA]." In the newscasts that are at issue, Wornick reported that Metabolife's founder and president, Michael Ellis, had previously pleaded guilty in federal court to felony charges related to the sale of methamphetamine and that his conviction had not been disclosed to regulatory authorities he and the company were lobbying not to regulate Metabolife 356. Wornick also reported that Metabolife marketed its product as safe and claimed that it had been "clinically tested for safety" but that it had not been tested for safety by Vanderbilt University, which directed it to stop saying so; and that"every expert we asked said Metabolife is not safe . . . because of its main ingredient . . . ma huang . . . ." Among others, WCVB interviewed Dr. George Blackburn, Director of the Center for the Study of Nutrition Medicine at Beth Israel Deaconess Medical Center in Boston and Associate Director of the Division of Nutrition at Harvard Medical School. At the time, he was about to testify before the Joint Committee on Health Care of the Massachusetts Legislature in support of a bill that would require the Massachusetts Department of Public Health to study the need for regulation of over-the-counter diet supplements. In the interview he stated:
 
 
 109
 The documents from the FDA hearings remained on the Internet in 1999, when we did this work years ago, and they know, even today as I know, there are people who are taking similar types of these products who are getting heart attacks, and of course the abuse can lead to death. But I mean, you can die from taking this product.
 
 
 110
 On the telecast, Blackburn was shown saying "you can die from taking this product."
 
 
 111
 After the last broadcast on May 13, Metabolife ran a fullpage advertisement May 15 in the Boston Globe. The copy states that "Metabolife 356 has been shown to be safe in two independent laboratory studies that were overseen by a former president of the American Board of Toxicology," and that Metabolife "will see Ms. Wornick and WCVB TV in court." Metabolife subsequently requested a retraction and filed suit May 27, 1999. The complaint alleges that nine statements made during the May 11-13 broadcasts have false and derogatory implications; only four remain in contention.
 
 
 112
 On June 21 WCVB and Blackburn filed a Special Motion to Strike pursuant to California's anti-SLAPP statute on the ground that Metabolife could not show that the challenged statements were false. The motion had the effect of staying discovery except for good cause. Cal. Civ. Proc. Code §§ 425.16(g).[5] Metabolife moved to compel a response to its discovery requests, but indicated that it required discovery only with respect to evidence necessary to make out a prima facie case of malice, as well as to establish personal jurisdiction and venue.
 
 
 113
 After the court requested briefing on twenty-one questions (including whether Metabolife's safety test results were published and subject to peer review, and whether other studies should be considered) and held a hearing on the anti-SLAPP motions, Metabolife again asked for discovery but only on issues relating to actual malice. The court decided that discovery on malice was not necessary for it to decide whether Metabolife established a prima facie case of falsity.
 
 
 114
 On this basis it granted the anti-SLAPP motion, dismissing the complaint with prejudice. I agree that this is the correct result under California law.
 
 II.
 
 115
 California's anti-SLAPP statute is designed to curtail lawsuits brought against speakers on issues of public concern "to obtain an economic advantage over the defendant[s], not to vindicate a legally cognizable right of the plaintiff." Wilcox v. Superior Court, 33 Cal. Rptr.2d 446, 450 (Cal. Ct. App. 1994).
 
 
 116
 There is no dispute that for purposes of §§ 425.16(b)(1), Wornick and WCVB-TV were speaking "in connection with a public issue" nominally protected by the First Amendment. To establish a probability of prevailing on its claim, Metabolife "must demonstrate the complaint is legally sufficient and supported by a sufficient prima facie showing of facts." Id. at 454. California recognizes the theory of defamation by implication, but a plaintiff may not construct an actionable statement by reading whatever implication it wishes into the defendants' words. "Whether published material is reasonably susceptible of an interpretation which implies a provably false assertion of fact -the dispositive question in a defamation action -is a question of law for the court." Couch v. San Juan Unified Sch. Dist., 39 Cal. Rptr. 2d 848, 854 (Cal. Ct. App. 1995).[6] "Just as the court must refrain from a hairsplitting analysis of what is said in an article to find an innocent meaning, so must it refrain from scrutinizing what is not said to find a defamatory meaning which the article does not convey to a lay reader[,]" or here, a lay observer. Forsher v. Bugliosi, 163 Cal. Rptr. 628, 634 (Cal. 1980) (quotations omitted); Church of Scientology v. Flynn, 744 F.2d 694, 696 (9th Cir. 1984) (quoting Forsher).
 
 A.
 
 117
 Metabolife argues that the broadcasts falsely imply that you can die from taking Metabolife 356 as directed . This is not literally what the telecast reported, so the additional implication of "as directed" is critical to the survival of Metabolife's claim. The district court asked the parties to brief whether the "can kill you" statement established a prima facie case if it were not modified by "as directed," and Metabolife answered "No." In answering "No," Metabolife agreed that "the literal words . . . cannot be proved false."
 
 
 118
 By "as directed," Metabolife means the directions for use on the product label. Likewise, each of Metabolife's experts predicated his or her opinion of the product's safety on use "as directed."[7] These experts were only asked for their opinion on whether Metabolife 356 when taken as directed poses a risk of death or serious injury. Each understood, in answering the question, that:
 
 
 119
 "Ordinary use" of Metabolife 356 and "used as directed" are defined by the product label instructions, as follows:SUGGESTED USE: As a Dietary supplement, orally, adults, ONE to TWO caplets, two to three time [sic] per day, or every four hours, on an empty stomach one hour before meals. DO NOT EXCEED EIGHT CAPLETS PER DAY. CAUTION: As with any Dietary supplement, seek advice from a healthcare practitioner prior to use if you are pregnant or nursing or if you have high blood pressure, heart or thyroid disease, diabetes, difficulty in urination due to prostate enlargement, or if taking a MAO inhibitor or any other prescription drug, or intend on taking to reduce weight. Reduce if nervousness, tremor or nausea occur. Not intended for use of persons under the age of 18. Keep out of the reach of children.
 
 
 120
 The opinion of Science, Toxicology & Technology Consultants (ST&T), the American firm Metabolife hired to summarize the results of the Chinese animal studies, is similarly qualified: "[I]t is our conclusion that the product #356 is safe when used as directed, (see package warnings and dose recommendations -5/95 product label.)." Therefore, for Metabolife to prevail, the statement "you can die from this product" must reasonably have communicated to the ordinary viewer that "you can die from this product if you use no more than eight caplets per day as a dietary supplement after having sought advice from a healthcare practitioner if you are pregnant, nursing, have high blood pressure, heart or thyroid disease, diabetes, difficulty in urination due to prostate enlargement, or are taking a MAO inhibitor or any other prescription drug, or you intend on using it to reduce weight."
 
 
 121
 To me, it is not reasonable to read into Blackburn's statement "you can die from taking this product" the implication that "you can die from taking this product as directed." Even so, the label cautions that advice should be obtained from a healthcare practitioner prior to taking the product to lose weight. Most importantly, to adopt Metabolife's position requires scrutiny of what was not said to find a defamatory meaning in what was said, and this we may not do. Forsher, 163 Cal. Rptr. at 634. Accordingly, I believe that the cause of action as to the "you can die" statement was properly stricken. It is unreasonable to imply that you can die from taking the product as directed on the label, and it is admittedly true that you can die from taking the product.
 
 B.
 
 122
 Metabolife contends that the statement "every expert we asked said that Metabolife is not safe because of its main ingredient, ma huang" impliedly communicates that"[t]here is a consensus in the medical community that taking Metabolife 356 is deadly." However, there is nothing defamatory about the "every expert" portion of the statement. In any event, as the district court found, "every expert we asked" cannot reasonably imply "a consensus in the medical community."
 
 
 123
 Metabolife argues that even if the district court were correct in this view, the statement is literally false. We should not consider this argument, because Metabolife's complaint nowhere states a claim based on the literal falsity of this statement. Regardless, it fails for the same reasons as the "you can die" statement: its falsity unreasonably depends on reading "as directed" into "not safe." In sum, it is unreasonable to impute to the statement "[e]very expert we asked said Metabolife is not safe because of its main ingredient, ma huang," the meaning that "there is a consensus that its use is deadly," as Metabolife would have us do. Not safe to experts consulted by Wornick is one thing; deadly from a consensus of all experts is another. The statement as broadcast was expressly limited to experts with whom Wornick talked, and it would be unreasonable to expand her qualified statement by implication to the entire medical community.
 
 C.
 
 124
 Metabolife maintains that the broadcasts falsely stated that Metabolife 356 and methamphemine share the same main ingredient. Wornick made several statements to the effect:
 
 
 125
 . . . [E]very expert we asked said that Metabolife is not safe because of its main ingredient Ma Huang-drug experts know it as ephedrine, a powerful heart stimulant. . . . The substance ephedrine has long had the attention of law enforcement, because it's also the main ingredient in the illegal drug methamphetamine. On the streets they call it meth, or speed.
 
 
 126
 The district court held that Wornick's statements are protected by the First Amendment because they are substantially true.
 
 
 127
 By definition a true statement cannot be defamatory, and "a statement on maters of public concern must be provable as false before there can be liability under state defamation law, at least in situations, like the present, where a media defendant is involved." Milkovich v. Lorain Journal Co., 497 U.S. 1, 19-20 (1990). Metabolife argues that falsity is a question for the jury, but "[w]hether a statement contains provably false factual assertions is a question of law for the trial court to decide." Eisenberg v. Alameda Newspapers, Inc., 88 Cal. Rptr. 2d 802, 821 (Cal. Ct. App. 2000). As the Supreme Court has observed:
 
 
 128
 California law permits the defense of substantial truth and would absolve a defendant even if she cannot `justify every word of the alleged defamatory matter; it is sufficient if the substance of the charge be proved true, irrespective of slight inaccuracy in the details. . . . Minor inaccuracies do not amount to falsity so long as `the substance, the gist, the sting, of the libelous charge be justified.'
 
 
 129
 Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 516-17 (1991) (quoting California law).
 
 
 130
 Metabolife (and the majority) rely on Dr. Farber's declaration, which indicates that ma huang is weaker and less apt to cause any adverse effects than the synthetic ephedrine because synthetic ephedrine is eight times more potent as an acute intoxicant than ma huang. However, Farber's observation is based on the Chinese toxicity studies and on ephedrine as an acute intoxicant in mice, which the studies themselves show are different from the toxicity level in rats and beagles, and presumably, though the studies do not say so one way or the other, in humans. It is not surprising that ephedrine made in a laboratory is more potent than the naturally occurring ephedrine found in a plant, but this has nothing to do whether Wornick's statement is substantially true or false. Metabolife does not dispute that the main ingredient of methamphetamine is ephedrine or that ma huang is a naturally occurring ephedrine.[8] Metabolife's label itself describes "Ma Huang Concentrate" as "naturally-occurring ephedrine." Metabolife's experts indicate that Metabolife 356 uses a concentration of ma huang to obtain its dosage of ephedrine, and that "[e]phedrine can be considered the major ingredient (approximately 77% composition of Ma Huang) in Metabolife 356." Wurpel Declaration at ¶¶ 16; see Bidanset Declaration at¶¶ 15.
 
 
 131
 That the source may be natural instead of synthetic, and that the naturally occurring variety may be less toxic than the variety someone chooses to make, says nothing consequential about whether the primary ingredient -ephedrine -is common to both Metabolife 356 and methamphetamine. The majority dismisses the point by observing that "[a]nyone who knows the difference between a double espresso and a regular cup of coffee should understand that a reasonable jury could have found this and other differences significant. " While apt, the coffee analogy is misplaced; it might be false to say a double espresso is the same thing as regular coffee, but it is not false to inform the public that both contain caffeine. I therefore agree with the district court that the distinctions Metabolife tries to draw between ma huang and ephedrine are immaterial and that Wornick's statements are substantially true.
 
 D.
 
 132
 Finally, Metabolife argues that the broadcasts implied that Metabolife 356 has not been tested for safety whereas, in fact, it had been (the Chinese animal studies). In Metabolife's complaint, the following statements from the broadcast are identified as the source of the alleged implication:
 
 
 133
 At nearly every major mall in the area, they sell it as safe and effective. . . . They even claim to have scientific proof. (Clip from Metabolife TV commercial): "Metabolife is the herbal dietary supplement clinically tested for safety." . . . Remember that ad calling Metabolife clinically tested for safety? Metabolife was tested at Vanderbilt University, but only for two weeks and, according to their attorney, not for safety. Vanderbilt officials have ordered Metabolife to stop making that claim. . . . (Wornick interviewing Blackburn): Does this company have any credibility at all, doctor? (Blackburn): None.
 
 
 134
 There is no dispute that Vanderbilt told Metabolife to stop citing its study as a safety study. As Dr. Harry Gwirtsman, one of the principal investigators of the Vanderbilt study, states in his declaration: "[T]his pilot study may not properly be used as an indication of the overall safety of Metabolife 356." Gwirtsman further indicates that "[t]hrough attorneys for Vanderbilt University, Metabolife was asked to stop promoting its product using the University's name and the pilot study to support claims of safety and effectiveness of Metabolife 356." Thus, Metabolife cannot prevail on the literal falsity of the report, but must proceed on the implication that there are no other tests.
 
 
 135
 I do not believe that Wornick's statements reasonably imply that the Vanderbilt study was the only one. Rather, she was simply (and legitimately) exposing the fallacy in a specific claim about clinical testing being made to the public about Metabolife 356.
 
 
 136
 But even if the implication is considered, it is limited to the Shanghai/Taiwan University study conducted on animals. As Metabolife's Medical Director acknowledges, that is the only study upon which its claim of testing for safety was based. See Decl. of Randy V. Smith, M.D., at ¶¶¶¶ 3,4. The Chinese studies (there was actually only one study but two universities were involved) did not purport to express any opinion about the safety of Metabolife 356 in humans. Nor did ST&T's report indicate that they had.[9] The Chinese studies were on mice, rats, and beagles. They lasted just fourteen days, were conducted outside United States protocols, were paid for by Metabolife, and were not peer reviewed in the several years since completion. At a dose level of 3270 mg/kg/day all four beagles had convulsions and two died. For them, at least, "[t]he present results showed that product 356 produced severe nervous toxicity." I cannot imagine that hearing all this would have had a different effect on viewers.[10] A "statement is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced." Masson, 501 U.S. at 517 (quotation omitted). As the district court concluded, even if Metabolife's alleged implication were reasonable that the Vanderbilt study was the only one, the Chinese studies are so insubstantial as to be "no studies" for purposes of establishing the gist of WCVB's speech and its substantial truth.
 
 III.
 
 137
 Metabolife argues that the district court based its dismissal on the erroneous exclusion of all of its expert evidence. This is not entirely correct, as the court's ruling on admissibility was alternative except in connection with Blackburn's statement "you can die from taking this product." In any event, I see no need to reach the issue of admissibility because I do not believe that Metabolife's implications are reasonable and there is no question that WCVB's statements are literally or substantially true. In my view, Metabolife's claims were properly stricken under the anti-SLAPP statute because it is not probable that Metabolife will prevail whether or not its experts' opinions are considered. Put differently, this case is about speech, not Daubert. However, I part company with the majority's view of Daubert as well.
 
 
 138
 Under Daubert, the court's gate-keeping function is a "twopart analysis," Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1315 (9th Cir. 1995) (Daubert II ), requiring both reliability -"whether the experts' testimony reflects scientific knowledge, whether their findings are derived by the scientific method, and whether their work product amounts to good science" -and relevance -to "ensure that the proposed expert testimony is relevant to the task at hand, i.e., that it logically advances a material aspect of the proposing party's case." Id. (quotations and citations omitted). The majority starts and stops with reliability, and even so, fails to accord the district court the deference that is owed. As the Court explained in Kumho Tire:
 
 
 139
 The trial court must have the same kind of latitude in deciding how to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides whether or not that expert's relevant testimony is reliable. . . . Thus, whether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine.
 
 
 140
 Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999).
 
 
 141
 As the district court found, the Chinese animal studies offer no basis for extrapolating from effects on mice, rats or beagles to humans. Metabolife's experts also recognize this; "straight extrapolation of animal data to humans is not appropriate." Bidanset Supp. Decl. at ¶¶ 5. Nor is the deficiency cured by Metabolife's risk assessment analyses. Soundly undertaken risk assessment may well be an accepted approach in the regulatory arena, but there is no evidence in this case that the Chinese protocols were developed through scientific consensus or that the studies were subject to oversight by government regulators, were governed by codes for good laboratory practice, or were following reliable research methodology. For these reasons the studies are of questionable reliability but regardless, they lack substantial probative value because neither ST&T nor any of Metabolife's experts opines that the animal studies alone show that Metabolife 356 is safe for humans as directed. This makes the results irrelevant.
 
 
 142
 The Columbia study was a safety and efficacy project that involved a substance similar to the active ingredients of Metabolife 356 (naturally occurring caffeine and naturally occurring ephedrine), but its safety component focused on the undue risk of serious cardiac problems. The Columbia study was not the basis for Metabolife's safety claims, and aside from the fact that there are more ways to die than from significant adverse cardiovascular events, the data from the study was still being prepared and the study cannot, therefore, be reliable in its proffered form.
 
 
 143
 Metabolife submits that there should have been a notice and hearing with respect to admissibility of its evidence, but I see no reason why the district court should have provided more opportunity to be heard than it did. Metabolife had the chance to produce all the evidence it wanted to produce as well as to brief and argue whatever points it wanted to raise. Nor do I see any purpose to be served by remanding for the court to plumb more depths, as the majority does, because there's nothing more to be plumbed. There is no conflict that an evidentiary hearing is required to resolve.[11] Fully crediting Metabolife's proffer, the question is whether its evidence is relevant and reliable for purposes of proving falsity under the anti-SLAPP statute. The district court has "broad latitude" in making admissibility determinations with respect to scientific evidence pursuant to the Daubert trilogy and Fed. R. Evid. 104, and I cannot say that the court here lacked discretion to rule as it did in deciding whether Metabolife established a probability of prevailing on its defamation claims.
 
 IV.
 
 144
 I also see no reason to reach whether Cal. Civ. Proc. Code §§ 425.16(g) directly collides with Fed. R. Civ. P. 56 or to reverse on this basis even if it does. So far as I can tell, Metabolife never made a Rule 56(f) request (for a continuance to permit discovery necessary for opposing the motion) to the district court and it is unclear to me that it should be able to make any argument based on Rule 56 to us. Further, both §§ 425.16(g) and Rule 56(f) allow for discovery that is needed to rule on the respective motions. They are not inconsistent on this account.
 
 
 145
 As a practical matter, evidence of actual malice is the only information I can think of that could be germane to an antiSLAPP motion but that was not under Metabolife's control. The district court recognized this, and explicitly cabined malice off from its ruling. Accordingly, Metabolife's claims did not fail at this stage for the lack of evidence"essential to [its] opposition." Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 250 n.5 (1986).
 
 
 146
 Nevertheless, the majority orders the district court to allow discovery as to which experts Wornick consulted because "the district court reached the issue of falsity regarding the statement `Every expert we asked said Metabolife is not safe because of its main ingredient, ma huang.' " I do not understand how anything that could be discovered on this point would make it more probable that Metabolife could prevail. Metabolife does not claim that there is anything defamatory about the "every expert we asked" part of Wornick's statement that "every expert we asked said Metabolife is not safe . . . ." Indeed, Metabolife acknowledges that its implied assertion of consensus or unanimity, even if false, is not derogatory. Discovering that Wornick lied about talking to experts or misrepresented what their opinions were would certainly tend to show malice, but could not possibly show that Metabolife 356 is in fact safe or that no one can die from using it. Because the falsity of Metabolife's claims can be decided as a matter of law for purposes of the anti-SLAPP statute, and discovery on malice is irrelevant whether we invoke Rule 56(f) or §§ 425.16(g), it is unnecessary to decide that the two conflict in this case even if they could in some other case.
 
 
 147
 Finally, assuming there is a conflict, the district court still has discretion to refuse discovery for purposes of Rule 56. The moving party has to "proffer sufficient facts to show that the evidence sought exists, and that it would prevent summary judgment." Chance v. Pac-Tel Teletrac Inc. , 242 F.3d 1151, 1161 n.6 (9th Cir. 2001). Metabolife failed to make any such showing, so there is no basis for reversal under Rule 56(f), let alone for ordering the district court to allow discovery.
 
 
 148
 I would affirm.
 
 
 
 Notes:
 
 
 [1]
 Section 425.16 provides in pertinent part: (a) The Legislature finds and declares that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process. To this end, this section shall be construed broadly. (b)(1) A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.
 (2) In making its determination, the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.
 (3) If the court determines that the plaintiff has established a probability that he or she will prevail on the claim, neither that determination nor the fact of that determination shall be admissible in evidence at any later stage of the case, and no burden of proof or degree of proof otherwise applicable shall be affected by that determination.
 
 
 [2]
 Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).
 
 
 [3]
 General Electric Co. v. Joiner , 522 U.S. 136 (1997).
 
 
 [4]
 In several states, bills were proposed to regulate the sale of products containing ephedrine. See, e.g., S.B. 1292, 1999-00 Leg., Reg. Sess. (Cal. 1999); H.B. 1068, 111th Gen. Assem., Reg. Sess. (Ind. 1999); A.B. 412, 220th Gen. Assem., Reg. Sess. (N.Y. 1997); H.B. 3549, 80th Leg., Reg. Sess. (Minn. 1997); see also Massachusetts Dept. of Public Health, DPH Issues Advisory on Herbal Dietary Supplements Containing Ephedra (Aug. 2, 1996).
 
 
 [5]
 Section 425.16(g) provides:
 All discovery proceedings in the action shall be stayed upon the filing of a notice of motion made pursuant to this section. The stay of discovery shall remain in effect until notice of entry of the order ruling on the motion. The court, on noticed motion and for good cause shown, may order that specified discovery be conducted notwithstanding this subdivision.
 
 
 [6]
 See also Dodds v. American Broadcasting Company, Inc., 145 F.3d 1053, 1065-66 (9th Cir. 1998) (affirming dismissal of several implied defamation claims as a question of law, because the statements were "not implications the [television] segment reasonably can be understood to convey").
 
 
 [7]
 Declarations of Cienki at ¶¶ 8, Farber at ¶¶ 7, Wurpel at ¶¶ 6, Meredith at ¶¶ 11, Bidanset at ¶¶ 6, and Strauss at¶¶ 19.
 
 
 [8]
 For example, Wornick stated in the February 9, 1999 broadcast that "ma huang . . . according to the FDA, is another name for the controversial substance ephedrine." Metabolife makes no contention that this is false. Metabolife also submitted the ma huang entry from the Physician's Desk Reference for Herbal Medicines, which lists "ephedrine" as one of ma huang's "other names."
 
 
 [9]
 The ST&T summary report concludes: "Based upon the results of the laboratory study performed on product #356, the scientific literature reviewed, the package warnings and labeling, and the research of the ST&T associates, it is our conclusion that the product #356 is safe when used as directed, (see package warnings and dose recommendations -5/95 product label.)."
 
 
 [10]
 The Strauss Columbia study was not finished or publically available at the time of the broadcasts, and still isn't. Thus, even were it otherwise reliable or relevant, the Columbia study cannot support Metabolife's prebroadcast claims or show that the implication for which it now contends is false.
 
 
 [11]
 It is clear that no evidentiary hearing is required; none was held in Kumho Tire, for example.